MIDLAND STEEL PRODUCTS CO., APPELLEE, *v.* INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL 486; TATE ET AL., APPELLANTS.

[Cite as *Midland Steel Prods. Co. v. U.A.W. Local 486* (1991), 61 Ohio St.3d 121.]

(No. 90–476—Submitted January 23, 1991—Decided July 10, 1991.)

*Duvin, Cahn & Barnard, Lee J. Hutton, Frank W. Buck* and *Charles A. Linn,* for appellee.

*Bobulsky & Grdina, William P. Bobulsky* and *Betty Grdina,* for appellants.

---

MOYER, C.J. For the following reasons, we hold that a nonparty aider and abettor is bound by a court's order under Civ.R. 65(D) only if the nonparty has actual notice of the terms of that order. Although the court of appeals erroneously applied a lesser standard in this case, we hold that the evidence of notice was sufficient even under the stricter standard. We also conclude that a sufficient foundation was laid for the admission of the videotapes into evidence. Finally, we hold that the trial court did not abuse its discretion when it denied the motion for continuance and sentenced two of the appellants to lesser punishment.

## I

## A

Civ.R. 65(D) states in pertinent part:

"Every order granting an injunction and every restraining order * * * is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise."

The parties agree that the appellants, except for Tate, were bound by the TRO only if they, as persons in active concert, received "actual notice of the order whether by personal service or otherwise." They disagree about the meaning of the phrase "actual notice of the order."

In *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 61, 556 N.E.2d 157, 163, we discussed this provision and held:

"Nonparties are bound by an injunction to ensure 'that defendants [do] not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.' *Regal Knitwear Co. v. NLRB* (1945), 324 U.S. 9, 14 [65 S.Ct. 478, 481, 89 L.Ed. 661, 666]. The

determination of breadth must be made on the facts of each case. *Vuitton et Fils S.A. v. Carousel Handbags* (C.A.2, 1979), 592 F.2d 126, 130. Persons acting in concert or participation with a party against whom an injunction has been issued must have actual notice of the injunction in order to be bound by it. Civ.R. 65(D); *Northeast Women's Center, Inc. v. McMonagle* (C.A.3, 1989), 868 F.2d 1342, certiorari denied (1989), 493 U.S. ——, 107 L.Ed.2d 210, 110 S.Ct. 261; *Neshaminy Water Resources Auth. v. Del–Aware Unlimited, Inc.* (1984), 332 Pa.Sup. 461, 469–470, 481 A.2d 879, 883."

Midland Steel contends, and the court of appeals agreed, that "actual notice of the order" requires only that the person have general knowledge that an order has been issued, rather than specific knowledge regarding the terms of the order. However, we reject this contention. A court's order is an "order" only to the extent of its terms. To know an order, one must know its terms. In *Planned Parenthood,* we cited favorably the following language from *Neshaminy:*

" * * * [P]ersons *not* parties to an injunction order are bound to observe its restrictions when those restrictions are known to such persons to the extent that they must not aid and abet its violation by others. In addition, if persons are not parties to the injunction order, but its terms are known to them and they are within the class intended to be restrained, they may not violate the injunction's restrictions. * * * It is clear that formal service of the order upon the alleged violators is not necessary prior to a contempt adjudication, as long as the parties had actual knowledge of the order. * * * " (Emphasis *sic;* citations omitted.) *Neshaminy, supra,* at 469–470, 481 A.2d at 883. We note that even Midland Steel's argument assumes that the appellants had at least sufficient knowledge of the terms of the TRO to know that it restrained union activities around the Midland Steel facility.

We hold that a court's order is binding on a nonparty aider and abettor under Civ.R. 65(D) only to the extent the nonparty had actual notice of the terms of the order by personal service or otherwise. The appellants, other than Tate, were bound by the June 2 TRO pursuant to Civ.R. 65(D) only to the extent they had actual notice of its terms.

Unlike the other appellants, appellant Tate was named as a party defendant in Midland Steel's complaint and was a chief shop steward for Local 486. Midland Steel contends that Tate was a "party" or an "officer" and that "actual notice of the order" was not necessary to bind Tate for purposes of Civ.R. 65(D). Tate argues that his status was that of a "party" and that, under Civ.R. 65(E), nothing less than service in accordance with Civ.R. 4 to 4.3 and 4.6 could bind him to the TRO.

Because Tate was not served with the complaint before his misconduct of June 8, we conclude that he was not a "party" for purposes of Civ.R. 65(D). Midland Steel's only allegation of service before June 8 is that the union's attorney had been served with the complaint and TRO on June 2. Midland Steel cites nothing in the record, however, to show that the union's attorney was Tate's attorney of record on June 2 or at any time before Tate's misconduct on June 8. See Civ.R. 5(B); *Ervin v. Patrons Mut. Ins. Co.* (1985), 20 Ohio St.3d 8, 20 OBR 80, 484 N.E.2d 695, syllabus.

That conclusion, however, does not dispose of Tate's argument. We reject Tate's contention that his designation as a party in the complaint meant that only service in compliance with Civ.R. 65(E) could bind him. The designation of Tate as a party in the complaint does not preclude another status listed in Civ.R. 65(D). Even though Tate had been named as a party, he could also be bound in his capacity as an "officer" or as a person "in active concert" under Civ.R. 65(D).

Although we believe that Tate, as a chief shop steward, was an "officer" for purposes of Civ.R. 65(D), we need not determine whether the "actual notice" language of the rule applied to him. Because Tate and the other appellants were given unconditional, definite sentences, they were convicted of criminal contempt. See *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 18 O.O.3d 446, 416 N.E.2d 610. We agree with the law as stated in *In re Carroll* (1985), 28 Ohio App.3d 6, 10, 28 OBR 15, 18, 501 N.E.2d 1204, 1208, that in cases of criminal, indirect contempt, it must be shown that the alleged contemnor intended to defy the court. See *Rowe v. Standard Drug Co.* (1937), 132 Ohio St. 629, 646, 9 O.O. 19, 26, 9 N.E.2d 609, 617. Cf. *Windham Bank v. Tomaszczyk* (1971), 27 Ohio St.2d 55, 56 O.O.2d 31, 271 N.E.2d 815, paragraph three of the syllabus (lack of intent not a defense to charge of civil contempt). Tate could not have intended to defy the court unless he had actual notice of the TRO terms he was violating. Consequently, if Tate were a union officer, and even if the "actual notice" language of Civ.R. 65(D) did not apply to him, actual notice of the TRO terms was nevertheless an essential element to his criminal contempt conviction. Accordingly, the same actual notice standard applied to each of the appellants.

### B

Criminal contempt must be proven beyond a reasonable doubt. *Brown, supra,* syllabus. We therefore must determine whether the trial court could reasonably conclude beyond a reasonable doubt that the appellants had actual notice of those TRO terms that they were convicted of violating. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

Although the evidence is not overwhelming, we conclude that the evidence was sufficient under this standard of review.

It is well-established that the state of mind of an accused may be proven by circumstantial evidence. *State v. Huffman* (1936), 131 Ohio St. 27, 5 O.O. 325, 1 N.E.2d 313, paragraph four of the syllabus; *Rowe, supra,* 132 Ohio St. at 646, 9 O.O. at 26, 9 N.E.2d at 617. In particular, "proof of the elements of criminal contempt may be established by circumstantial evidence." *Walker v. City of Birmingham* (1967), 388 U.S. 307, 312, 87 S.Ct. 1824, 1827–1828, 18 L.Ed.2d 1210, 1215, fn. 4.

Under the circumstances of this case, the trial court reasonably could have concluded that the appellants were aware of the terms of the TRO. The evidence showed that a number of the appellants' associates had their attention drawn directly to the TRO by way of attempted personal service or posting. Fifteen to twenty copies of the TRO were distributed shortly after its issuance, and the TRO was delivered to the union hall. Local president McGhee clearly was aware of the terms of the TRO, and the evidence showed that he was present when six of the appellants, and possibly a seventh, committed their acts of misconduct. A newspaper provided another source by which union members' attention could have been drawn to the TRO.

Despite the existence of these numerous possible sources of information regarding the TRO, the appellants contend that the evidence showed that they at most knew of the limit of two pickets per entrance. Four of the appellants, Tate, Orbas, Gregg, and Monahan, testified to that effect. Tate and Orbas testified that they knew that a court order had been issued but that they were told only of the two-picket limit. Gregg and Monahan testified that they knew of the two-picket limit but did not know that the limit was the result of a court order. A fifth appellant, Vano, testified that he "vaguely" understood that a court order provided a two-picket limit and prohibited those pickets from obstructing traffic. The appellants contend that their compliance with the two-picket limit showed only that they knew of that limit, not the other limits in the TRO. Essentially, the appellants argue that their union leadership successfully shielded them from any knowledge of the TRO except the two-picket limit.

These arguments are not persuasive. We first note as a matter of credibility that the appellants' testimony need not be accepted as true. Furthermore, in light of the availability and probable notoriety of the TRO among picketers because of publicity and posting, the trial court reasonably could have rejected the appellants' contention that the union leadership had successfully shielded them from knowledge of the TRO terms. The pervasive presence of the TRO in the area of the Midland Steel facility suggests that the union leadership

could not have shielded union members from knowledge of the terms of the TRO. The trial court could also have reasonably rejected the appellants' contention that they knew of the two-picket limit but not of the other limits in the TRO. In combination with the other circumstances in this case, the appellants' knowledge of the two-picket limit, as demonstrated by their compliance with that limit, raises an inference that they knew of the other limits in the TRO.

The trial court reasonably could have concluded under these circumstances that the appellants, rather than somehow having avoided knowledge, had in fact gained knowledge of the terms of the TRO.

Finally, we note the particular evidence concerning Tate, Orbas, Vano, and Monahan. Tate testified that he was responsible for assigning persons to picket duty and overseeing the conduct of the strike. Vano testified that he performed similar assignment duties as a strike "coordinator." The trial court could have inferred from this evidence that they had special access in those positions to knowledge regarding the TRO. Furthermore, both Orbas and Monahan admitted that they had performed picket duty prior to their misconduct. Their performance of picket duty raised an inference that they had seen the copies of the TRO that were posted at the facility's entrances. In light of the foregoing evidence, we find the evidence sufficient to support the criminal contempt convictions of each of the appellants.

## II

In their fourth proposition of law, the appellants contend that the videotapes of strikers' conduct were inadmissible because they were not "authenticated by the introduction of testimony that the films accurately depict the events portrayed." Appellants attack the testimony of Helton, by arguing that Helton could not authenticate the videotapes because he had not viewed the misconduct personally but, rather, solely by means of video cameras.

Under Evid.R. 901(A), Midland Steel could introduce the videotapes into evidence only upon a sufficient showing that they accurately depicted appellants' misconduct. In *Fisher v. State* (1982), 7 Ark.App. 1, 5–6, 643 S.W.2d 571, 573–574, the court summarized two of the methods for authenticating photographic evidence like videotapes:

"The admissibility of photographic evidence is based on two different theories. One theory is the 'pictorial testimony' theory. Under this theory, the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation. * * * A second theory under which photographic

evidence may be admissible is the 'silent witness' theory. Under that theory, the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness. * * * " (Citations omitted.) See, also, *United States v. Rembert* (C.A.D.C.1988), 863 F.2d 1023.

In challenging Helton's testimony because he viewed the events solely by means of video cameras, the appellants clearly are proceeding under the pictorial testimony theory. However, assuming the videotapes were inadmissible under that theory, they were admissible under the silent witness theory, whether or not Helton was able to corroborate them as a fair and accurate representation of the events they recorded. Under the silent witness theory, photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence. McCormick, Evidence (3 Ed. Cleary Ed.1984) 672, Section 214. See *United States v. Rembert, supra,* at 1026. In support of this theory of admissibility, Midland Steel was not required to produce expert testimony regarding the reliability of its video surveillance system. *United States v. Hobbs* (C.A.6, 1968), 403 F.2d 977, 978. Rather, Midland Steel could show by lay testimony that the system was reliable. See, also, Evid.R. 201.

Helton provided sufficient testimony to support a finding that the surveillance system and the videotapes it produced were reliable. Helton was able to testify from personal knowledge about the layout of the main gate in relation to the transmission shop and the union hall. He repeatedly referred to these known features as he described the summary videotape in his testimony. He impliedly authenticated the accuracy of the surveillance system and the videotapes each time he described the location of these known features. Since the summary videotape depicted these known features accurately, it was likely that it also depicted the appellants' misconduct accurately. In addition, Helton testified that he was the custodian of the videotapes, that he knew of no method of altering the videotapes, that he had not altered the videotapes, and that the videotapes accurately depicted what he had seen while he personally monitored the surveillance system. The summary videotape showed no sign whatsoever of fabrication. Under these circumstances, Midland Steel adequately showed the reliability of the surveillance system and the videotapes produced by it. Accordingly, we overrule the appellants' challenge to the videotape evidence.

### III

We find no abuse of discretion in the trial court's decision to overrule the appellants' motion for a continuance. *Pease Co. v. Local Union 1787* (1978),

59 Ohio App.2d 238, 13 O.O.3d 246, 393 N.E.2d 504. Seven of the appellants were given approximately one week to prepare for the trial. The charges were not complex. In light of the physical violence at the Midland Steel facility, the court's avoidance of delay was justified. Although appellant Tate was given just two days to prepare a defense, the allegations against him were likewise not complex. Moreover, Tate's attorneys were able to use the full week to prepare vis-a-vis the general circumstances of the strike at Midland Steel and the issue of actual notice.

We reject the appellants' contention that a continuance was necessary because they could not review the many hours of videotape in the limited time before trial. The appellants clearly had either personal knowledge of the events recorded or ready access to union members who had such knowledge. They could prepare a defense without viewing the videotapes. Also, the appellants could have exploited the time during trial, including the intervening weekend, to review the videotapes. Under the circumstances, the appellants were given a reasonable period of time to prepare their defense. In any event, they do not indicate how their defense would have changed had they been granted a continuance. See *In re Timmons* (C.A.5, 1979), 607 F.2d 120, 125. The appellants therefore have not shown prejudice.

The appellants assert, however, that the denial of the continuance deprived them of their right to conduct discovery under the Civil or Criminal Rules and under due process. We are not persuaded. For purposes of argument, we assume that the discovery provisions of the Civil or Criminal Rules applied to these contempt proceedings. Based on that assumption, the appellants might have obtained substantial relief under the rules had they demanded expedited discovery. See, *e.g.*, Civ.R. 33(A); Civ.R. 34(B); Crim.R. 16(E)(2). They made no such demand. Although it was unlikely that the appellants could receive full discovery in the limited time before trial, the trial court nevertheless could exercise its discretion under the rules to limit discovery to that which could be obtained within the week before trial. See *Pease Co., supra*, 59 Ohio App.2d at 240, 13 O.O.3d at 248, 393 N.E.2d at 506 (trial court could exercise sound discretion in avoiding "protracted legal maneuvering" in context of "incendiary" labor dispute). Moreover, contrary to the appellants' contention, "[t]here is no general constitutional right to discovery * * *," even in a criminal case. *Weatherford v. Bursey* (1977), 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42. The appellants have not shown that Midland Steel withheld any exculpatory evidence. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Their claims concerning the denial of discovery are therefore without merit.

The appellants also contend that they were deprived of the opportunity to review notes and reports made by two witnesses for Midland Steel and to call certain witnesses for the defense who were unavailable during the second week of trial. The appellants were not "deprived" of the notes and reports before trial because they failed to demand expedited discovery of those documents. Moreover, the appellants have not indicated how they were "deprived" of the opportunity to review the notes and reports during trial or how they were prejudiced by not having them. Furthermore, the witnesses who were unavailable during the second week of trial could have been called out of order during the first week. Appellants have not shown prejudice because they have not indicated by reference to a proffer in the record how these witnesses would have testified. The trial court did not abuse its discretion.

## IV

Finally, we conclude that the trial court did not abuse its discretion in sentencing other egg-throwing appellants to greater sentences than Vano and Markiewicz. We agree with the court of appeals that:

" * * * [I]t is clear from the record that the conduct of Vano and Markiewicz was unlike the conduct of the other defendants. That is, unlike Markiewicz, Titlow and Orbas actually struck vehicles with eggs, thereby subjecting them to almost immediate damage. * * * Further, whereas Vano offered in mitigation that his conduct was the result of frustration from the circumstances surrounding the strike, Langford offered no explanation for his conduct. * * * "

The appellants contend that the foregoing analysis was flawed because appellant Orbas also testified to the existence of mitigating circumstances. However, unlike Vano, Orbas continued to deny at sentencing that the eggs he threw had struck a replacement worker's vehicle. Under these circumstances, the trial court's slightly lesser sentences for Vano and Markiewicz were not unreasonable, arbitrary, or unconscionable, and therefore did not constitute an abuse of discretion. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. We likewise reject the appellants' contention that their sentences were excessive in relation to their misconduct. The trial court did not abuse its discretion.

Based on the foregoing, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

Holmes, Wright and H. Brown, JJ., concur.

Sweeney, Douglas and Resnick, JJ., dissent.

Wright, J., concurring. While concurring in the majority opinion, I write separately to address the avowed concerns of the dissent of my colleague.

The judiciary cannot act as the cat's paw for either management or labor where there is a breakdown in the collective bargaining process. I know from personal experience that the actions of the impartial arbiter—the peacemaker, if you will—rarely please either party. For my part, I understand full well the realities of a hotly disputed strike. The same is true of the trial judge who handled this unhappy affair and the three members of the court of appeals who affirmed his decisions. The protection of the public was maintained and the rule of law upheld.

As to the specific complaint of the dissent, individual service of process on all striking workers of restraining orders would be next to impossible and far less effective than posting the orders at picket sites and at union halls.

A striking employee so inclined can avoid service of process for weeks, thereby clothing the striker with ignorance of the restraining order and immunity therefrom under the dissent's rationale. Civ.R. 65(E) provides for service of restraining orders pursuant to Civ.R. 4.1 through 4.3 governing service of process generally. Civ.R. 4.1 provides the three primary methods for service, all of which are ineffective at giving a striker actual notice of an order if the striker does not want notice. Service by certified mail may be refused, personal service may be avoided, and service by ordinary mail may easily be disclaimed under the dissent's beyond-a-reasonable-doubt standard for actual notice of restraining order contents.

On the other hand, the posting of restraining orders at picket sites and at union halls coupled with personal service on union leaders makes defendants' disclaimer of notice look rather incredible.

Far more troublesome than the dissent's naive acceptance of defense allegations of ignorance is the silent approval of the defendants' acts. The defendants were not held in contempt for violating provisions of the restraining order that would have been lawful but for the order. The defendants were convicted of violent and destructive behavior—criminal irrespective of the restraining order and not protected by any collective bargaining law anywhere. Keeping that behavior in perspective, it hardly seems inappropriate for the trial court to reprimand the defendants' misconduct within the framework of the labor dispute and the restraining order.

Accordingly, I concur with the majority opinion and with the actions of the trial court.

DOUGLAS, J., dissenting. I dissent. The majority makes quantum leaps of assumption in order to arrive at its desired result. In doing so, the majority ignores the facts of record, the Civil Rules and the case law of this court.

When an injunction or restraining order is granted in a case, Civ.R. 65(D) requires that *actual notice* of the order be received by those sought to be enjoined or restrained when such persons are " * * * in active concert or participation * * * " with " * * * parties to the action, their officers, agents, servants, employees, [and] attorneys * * *." The defendants here were not parties to the action, nor were they officers, agents, servants, employees or attorneys of any party to the action. Therefore, in order to be bound by the temporary restraining order ("TRO"), the defendants must have had actual notice of the order and, of course, the content of the order.

The majority properly holds that Civ.R. 65(D) requires more than just notice of the existence of an order. The persons sought to be enjoined as "participants" must know the *terms* of the order. We established and made clear these requirements in *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 556 N.E.2d 157.

Thus, how does the majority show actual knowledge of these defendants of the terms of the order so that the majority can uphold sending the defendants off to jail? Simple. The majority finds that " * * * a number of the appellants' [defendants'] associates had *their* attention drawn directly to the TRO by way of attempted personal service or posting * * * " (emphasis added) and, apparently, it therefore follows that *these* defendants must have had actual knowledge of the terms of the order. Further, says the majority, " * * * [f]ifteen to twenty copies of the TRO were distributed shortly after its issuance, and the TRO was delivered to the union hall. * * * " Therefore, again according to the majority, it must follow that *these* defendants had actual notice of the terms of the order. Even, says the majority, the president of the local, McGhee, was aware of the terms of the TRO and, thus, according to the majority, it again must follow that the defendants had actual notice of the terms of the order. Then, the final straw! A local newspaper, says the majority, " * * * provided another source by which union members' attention could have been drawn to the TRO."

Against this "evidence" we have the *sworn* testimony of the defendants that, at most, they were aware that there was some court order and that the order limited pickets to two per entrance—a section of the order, incidentally, that defendants were not charged with or convicted of violating. Even given all this, the majority still finds that the criminal contempt of the defendants was " * * * proven beyond a reasonable doubt." Obviously, if the position of the majority is accepted, the standard of proof must have been met because at

least two of the defendants " * * * admitted that they had performed picket duty prior to their misconduct. Their performance of picket duty raised an inference that they had seen the copies of the TRO that were posted at the facility's entrances. * * * "

It is on the basis of these inferences, as opposed to actual testimony, that these defendants are going to jail. The record is clear as to the volatility and confusion surrounding the strike. This is not unlike most work stoppages that are being hotly contested—especially when an attempt is being made to break a strike with replacement workers. To assume that each person on the picket line knows the terms of an order, absent, of course, a general announcement either at the picket line or at a union meeting attended by those persons charged with violation, is to ignore reality. Without the majority's presumption upon presumption, there is no showing that beyond a reasonable doubt, the defendants herein had the notice of the order as required by Civ.R. 65(D).

With regard to defendant Tate, the majority again shows its lack of knowledge in this field. The majority says that " * * * [e]ven though Tate had been named as a party, he could also be bound in his capacity as an 'officer' * * *." In one fell swoop, the majority makes a chief shop steward an "officer" of UAW Local 486 and maybe even an officer of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America. I am sure this will come as a real surprise to Tate as well as others who are concerned and knowledgeable.

Tate was a named party. As such, for him to be bound by the order, he was required to be served with the order in accordance with Civ.R. 65(E). It is unrefuted that he had not been served at the time of his alleged misconduct. Therefore, Tate could not be bound by an order he had never received unless, of course, we make another one of the giant leaps of faith of the majority and assume he must have known about the order because others in the vicinity had heard about it. We move very quickly from the sublime to the ridiculous.

While other errors alleged by defendants may have some merit, I never reach those issues because I find that the Civil Rules were promulgated for the protection of all—even union members; and because Civ.R. 65(D) and (E) were not complied with in this case, appellants cannot be in contempt of the order of the trial court.

I vigorously dissent from the judgment of the majority.

SWEENEY, J., concurs in the foregoing dissenting opinion.

ALICE ROBIE RESNICK, J., dissenting. I respectfully dissent from the majority opinion. While paragraph one of the syllabus is a correct statement of the law, today's majority applies it incorrectly to the facts of this case.

Civ.R. 65(D) provides in pertinent part:

"Every order granting an injunction and every restraining order * * * is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise."

The use of the word "actual" preceding the word "notice" is of great importance. Persons who do not receive actual notice cannot be bound by an injunction or restraining order.

The majority contends that since the TRO was posted on the building entrances, since fifteen to twenty copies of the TRO were in circulation, and since a newspaper printed a story regarding this matter, actual notice was given. At best, the foregoing method of notice is constructive; it certainly can not be construed as actual. In order to give actual notice of the contents of a TRO, something more has to be done than simply posting copies thereof on the building entrances and placing a number of copies in circulation. For the contemnors to receive actual notice, we must be able to say with substantial certainty that they all had an opportunity to receive a copy of the TRO and acquaint themselves with it. This could have been accomplished quite simply by Midland if it had circulated copies of the TRO or a summary thereof to all employees. This was not done in this case. Actual notice can never be presumed or inferred from the facts. It must be clearly established by the evidence that each individual involved actually had an opportunity to be served or otherwise be informed of the contents of the TRO. Actual notice was not given to the contemnors in this case and therefore the judgment of the court of appeals should be reversed.