OPINION.
{¶ 1} Appellant William B. Church, III, appeals from the judgment of the Hamilton County Court of Common Pleas, Probate Division, finding him in contempt and sentencing him to pay a $200 fine. In his three assignments of error, he contends that the probate court's finding of contempt must be reversed because the judgment (1) was based on insufficient evidence; (2) was against the manifest weight of the evidence; and (3) violated the due-process safeguards guaranteed by theFourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution. Because Church's right of due process was violated when he was not given notice of the contempt charge before the probate court found him guilty and sentenced him for indirect criminal contempt, the judgment of the probate court is reversed.
 {¶ 2} Church is the attorney for the estate of Carol J. Carrier. The decedent's son, Brian Carrier, is the executor. The beneficiaries under the Carrier will are her children, Brian, Charles, and Scott Carrier, and Shelly Turner. A hearing was set for March 21, 2003, at 1:30 p.m. before the probate court on Brian Carrier's application to pay executor fees in the sum of $2,858 and for reimbursement of his out-of-pocket expenses in the sum $771.85, and on Charles Carrier's objections to the application filed with the magistrate and journalized on March 3, 2003.
 {¶ 3} While the hearing was in progress before the probate court, Brian Carrier's two brothers and sister, having been told by the court receptionist that they were at the right place, were waiting in front of the magistrate's office on the floor below the courtroom. Church and Brian Carrier appeared at the hearing. Church informed the probate court that the executor's application was before the court, rather than the magistrate, because Charles Carrier had filed objections. When the probate court asked Church if Charles Carrier had been notified of the date and time of the hearing, Church advised the court that it was his understanding that the magistrate had given notice of the hearing, but he was unaware of the manner of service. The court acknowledged that the journalized entry stated that notice of the hearing had been sent to both Church and Charles Carrier and approved the executor's application.
 {¶ 4} The record indicates that, shortly after the hearing, Brian Carrier's brothers and sister conferred with the court to express their dissatisfaction with the way in which Brian Carrier and Church were treating them and were handling the estate. The court explained to them that their mother's will, and not her oral statements to them, was what determined how her estate was to be distributed. It also explained that the value of the estate assets reported in the inventory and their distribution were subject to court approval in the final account. It informed them that it regretted the confusion, stating, "Our people should have been a little sharper in terms of directing you, frankly."
 {¶ 5} It was then that Shelly Turner said, "Well just to prove that Mr. Church isn't representing us, he seen us downstairs." When the probate court inquired as to the time, Charles Carrier said that it was "[b]efore 1:30 or right around 1:30." Shelly Turner told the court, "We seen them on two different occasions. One time coming off the elevator and then one time going to the stairs. That's why I didn't understand what was going on I said, you know, `why then aren't we starting?' Because, you know, it was right around 1:30 then. So I don't know if they came up here and then came back down."
 {¶ 6} The probate court convened a third hearing later that same day, as confirmed by the court's entry journalized on March 24, 2003. At that hearing, Church appeared, as did the executor's three siblings and the court bailiff. Brian Carrier was not present. The witnesses were sworn and testified under oath. The testimony established that, after the hearing before the court, Church and Brian Carrier, in the company of the bailiff, had gone to the floor below the courtroom to journalize the entry granting the executor's application for fees and out-of-pocket expenses and to make copies of the entry. The bailiff testified that he went to the door of the issue desk, but turned to caution Church and Brian Carrier not to follow him inside. When he turned, he heard Brian Carrier, who was standing less than a foot from Church, say, "There they are." When questioned by the probate court, Church stated that he had not heard Brian Carrier's comment. The bailiff testified that he could not state whether Church had heard his client's comment.
 {¶ 7} The Carrier siblings testified that Brian Carrier had looked at them when he and Church walked past them in the company of the bailiff. Church told the court that he had met Scott Carrier and Shelly Turner but that, despite significant correspondence with Charles Carrier, he had never met him. The Carrier brothers were unable to say if Church had seen them. The only testimony implicating Church was developed in the following cross-examination of Shelly Turner conducted by Church:
 {¶ 8} Church: "Did I, at any time, look at you?"
 {¶ 9} Shelly: "I'm not sure if you looked at me or not. I mean yous were walking our way, so, you know, Brian looked at us. We made eye contact."
 {¶ 10} Church: "Okay. You cannot say for a fact that I looked at you."
 {¶ 11} Shelly: "It looked as if you did to me."
 {¶ 12} In finding Church in contempt, the probate court concluded that Brian Carrier knew that his brothers and sister were present on the lower floor at the time of the hearing on his application for fees and expenses, and that, because of his proximity to Brian Carrier, Church had overheard his comment and was aware, after the hearing, of the presence of the brothers and sister. The court imposed a $200 sanction with the observation that "[i]f your client pays it, I'm not going to object in this particular case."
 {¶ 13} The contempt jurisdiction of the probate court is established by R.C. 2101.23, which provides that "[t]he probate judge may punish any contempt of his authority as such contempt might be punished in the court of common pleas." Contempt may be direct, which involves conduct occurring in the presence of the court, or indirect, where the contumacious act occurs outside the presence of the court, but obstructs the orderly administration of justice. See In the Matter of Landis
(1946), 146 Ohio St. 589, 595, 67 N.E.2d 433. Pursuant to R.C. 2705.01, a court "may summarily punish a person guilty of misbehavior in the presence or so near the court or judge as to obstruct the administration of justice," because the court has personal knowledge of the facts, and the conduct is such as to constitute an imminent threat to the administration of justice. See In re Oliver (1948) 333 U.S. 257,275-276, 68 S.Ct. 499; State v. Moody (1996), 116 Ohio App.3d 176,687 N.E.2d 320; see, also, Chinnock and Painter, The Law of Contempt of Court in Ohio (2003), 34 Toledo L.Rev. 309, 321-326.
 {¶ 14} In its appellate brief, the state, defending the finding of contempt, argues that Church's alleged misconduct was a direct contempt subject to being summarily punished. The probate court, however, because it did not have direct knowledge of the facts of the alleged contempt, followed the procedure for an indirect criminal contempt by holding a hearing and taking evidence before rendering a decision.
 {¶ 15} Where, as here, the acts or omissions occur outside the presence of the court, and where confinement is a possible sanction, an accused contemnor has "many of the significant constitutional safeguards required in criminal trials." Brown v. Executive 200, Inc. (1980),64 Ohio St.2d 250, 212, 416 N.E.2d 610, quoting State v. Kilbane (1980),61 Ohio St.2d 201, 205, 400 N.E.2d 386. These rights include reasonable notice before the hearing, the right to reasonable time to prepare a defense, the right to counsel, the right to subpoena and call witnesses, the right to invoke the privilege against self-incrimination (although the contemnor may be called as a witness), the right to an impartial judge, and proof of guilt beyond a reasonable doubt. See Chinnock and Painter, The Law of Contempt in Ohio, supra, at 337-346.
 {¶ 16} A court's finding of contempt will not be disturbed on appeal absent an abuse of discretion. See State ex rel. Delco MoraineDiv., Gen. Motors Corp. v. Indus. Comm. (1990), 48 Ohio St.3d 43, 44,549 N.E.2d 162. An abuse of discretion connotes more than an error of law or judgment, implying that the court's attitude is unreasonable, arbitrary or unconscionable. See Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 17} Here, while the probate court generally followed the procedure for an indirect criminal contempt occurring outside the presence of the court, the record is silent as to whether Church had notice that he was on trial for contempt. There is in the record no written notice of the charge against Church, as required by R.C. 2705.03, and no suggestion that he was charged with contempt. Furthermore, the first mention of "contempt" in the transcript of the contempt hearing does not appear until the Carrier brothers, Turner, and the bailiff had testified and Church had responded to the questions of the court. It was only then that the court peremptorily held Church in contempt.
 {¶ 18} An essential ingredient of due process in an indirect criminal contempt is notice of the charges, setting forth the alleged misconduct with particularity and given sufficiently in advance of the proceeding to allow the accused to prepare. See In re Oliver (1948),333 U.S. 257, 278, 68 S.Ct. 499; see, also, State ex rel. Johnson v.Perry Cty. Court (1986), 25 Ohio St.3d 53, 57-58, 495 N.E.2d 16; Oak HillBanks v. Ison, 4th Dist. No. 03CA5, 2003-Ohio-5547. "Because contempt proceedings affect personal liberty, the proceedings and statutes governing them must be strictly construed." In re Contempt of Court
(1972), 30 Ohio St.2d 182, 187, 283 N.E.2d 126. "Due process of law * * * does not allow a hearing to be held without giving * * * [defendants] timely notice in advance of the hearing, [and] of the specific issues that they must meet." State ex rel. Johnson v. Perry Cty. Court,25 Ohio St.3d at 58, 495 N.E.2d 16, quoting In re Gault (1967), 387 U.S. 1,33-34, 87 S.Ct. 1428.
 {¶ 19} The prejudice to Church when he did not receive notice of the contempt charge is vividly apparent in this record. Absent notice, he had no reason to suspect that he was the target of possible sanctions by the court. From the transcript of the proceedings, it appears that the only reason he was recalled before the court was to provide information as an officer of the court. The specifics of the contempt were also of vital importance to Church's defense, because the allegations of his misconduct as the attorney for the estate changed during the hearing. Following his interview with the Carrier brothers and Turner in chambers, the court suspected that Church had made false statements at the hearing on the executor's application for fees and expenses and on the objections. As the hearing proceeded, it became evident that only Brian Carrier, and not Church, may have known of his siblings' presence on the floor below the courtroom before the hearing. The accusations then focused on Church's failure to inform the court of the siblings' presence upon discovering them after the hearing.
 {¶ 20} Because Church had no notice of the charge of contempt, the probate court abused its discretion when it found Church in contempt and sentenced him. We hold that the lack of notice of the contempt charge violated Church's right of due process, including the written notice required by R.C. 2705.03. Church's third assignment of error is sustained.
 {¶ 21} Although the standard of proof required for indirect criminal contempt is proof of guilt beyond a reasonable doubt, we disagree with Church's argument, made in his first assignment of error, that there was insufficient evidence for the probate court to find him in contempt. See Brown v. Executive 200, Inc., syllabus. The United States Constitution prohibits the criminal conviction of any person except upon proof sufficient to convince the trier of fact of guilt beyond a reasonable doubt. See In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068. As the Ohio Supreme Court has explained in State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541, "sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a [judgment of conviction] is a question of law." To reverse a conviction for insufficient evidence, a reviewing court must be persuaded, after reviewing the evidence in a light most favorable to the prosecution, that no rational trier of fact could have found the elements of the crime beyond a reasonable doubt. See State v. Waddy (1991), 63 Ohio St.3d 424,430, 588 N.E.2d 819, certiorari denied (1992), 506 U.S. 921, 113 S.Ct.338.
 {¶ 22} Since indirect criminal contempt must be proved beyond a reasonable doubt, the issue for review is whether Church heard the comments of the executor concerning the presence of the Carrier brothers and Turner, and, if so, whether he had a duty to report that fact to the probate court after the hearing for fees and expenses had concluded. Proof of the elements of criminal contempt may be established by circumstantial evidence. See Midland Steel Prods. v. Internatl. Union (1991),61 Ohio St.3d 121, 128, 573 N.E.2d 98. Church's reliance on Hegelaw v.State (1927), 24 Ohio App. 103, 107, 155 N.E. 620, for the proposition that a contemnor's false statement must be a matter of the court's personal knowledge, rather than merely its opinion, is inapposite as that appeal involved a direct contempt in the presence of the court.
 {¶ 23} Based upon the testimony of Shelly Carrier, the probate court reasonably could have drawn the inference and concluded that Church had looked at and saw the Carrier brothers and Turner when Brian Carrier, then only a foot away from him, said, "There they are." The more important question is whether Church had a duty to report the Carriers' presence to the court and whether his failure had such an obstructive effect on the administration of justice that it required punishment to vindicate the court's authority. See In re Oliver, 333 U.S. at 274-276,68 S.Ct. 499. Church's conduct arguably raised an inference that he had assisted a fraud on the court by his client, in violation of DR 7-102(A)(7), or that he had concealed that which he was required to report, in violation of DR 7-102(A)(3). If so, there was evidence of an indirect criminal contempt. Therefore, as a rational trier of fact could have found that Church was in contempt, his first assignment of error is overruled.
 {¶ 24} Church's second assignment of error, in which he challenges the manifest weight of the evidence adduced to support the order of contempt, is rendered moot by our disposition of the third assignment of error and our order of remand to the probate court. See App.R. 12(A)(1)(c).
 {¶ 25} The judgment of the trial court is reversed, and this cause is remanded for a rehearing or other proceedings consistent with this Opinion.
Judgment reversed and cause remanded.
Painter and Winkler, JJ., concur.