**The STATE of Ohio, Appellee,**

v.

**CONNER, Appellant.**

[Cite as *State v. Conner*, 192 Ohio App.3d 166, 2011-Ohio-146.]

Court of Appeals of Ohio,
Sixth District, Fulton County.

Nos. F–07–025 and F–07–026.

Decided Jan. 14, 2011.

Scott Haselman, Fulton County Prosecuting Attorney, and T. Luke Jones, Assistant Prosecuting Attorney, for appellee.

Deborah Kovac Rump, for appellant.

CosME, Judge.

{¶ 1} This appeal arises from a judgment of the Fulton County Court of Common Pleas, following a jury verdict finding appellant guilty of rape, burglary, and aggravated burglary. We conclude that appellant's rape conviction was not against the manifest weight of the evidence, but the burglary and aggravated-burglary convictions were improperly predicated on an ex parte domestic-relations order. Therefore, we affirm in part and reverse in part.

{¶ 2} Appellant, Todd W. Conner, was indicted in two separate cases. In case No. 06CR000177, he was charged with two counts of burglary. In the second case, No. 06CR000181, he was indicted on two counts of rape and one count of aggravated burglary. The charges all stemmed from incidents at the marital residence on October 27, November 1, and December 8, 2006, between appellant and his estranged wife ("S.C.") during the pendency of their divorce proceedings.

{¶ 3} After a jury trial, appellant was found guilty on one count of rape, the aggravated-burglary count, and one burglary count. The jury acquitted appellant on the other burglary and rape counts. Appellant was sentenced to incarceration of four years for the burglary conviction, five years for the aggravated-burglary conviction, and five years for the rape conviction. The sentences were ordered to be served consecutively, resulting in a total term of imprisonment of 14 years.

{¶ 4} This appeal was timely brought. However, after the trial proceedings were transcribed, appellant's counsel discovered that the transcript omitted appellant's entire direct testimony, as well as the entire testimony of, or reference to, appellant's witness, Amber Van Gunten. The equipment had failed to record portions of the record.

{¶ 5} Appellant's counsel filed a motion to supplement the record, pursuant to App.R. 9, noting that the proceedings had been tape recorded, and several gaps in the recording indicated that the missing testimony could not be obtained. Counsel also noted that "there were other less serious gaps in the tapes. However, trial counsel simply can not remember what specifically may be excluded." A proposed supplement to the record, containing information related to the missing portions of the record, was stipulated to by the parties and adopted by the trial court. Pursuant to App.R. 9(C), this supplemental statement was added to the record for purposes of this appeal.

{¶ 6} Appellant argues four assignments of error. We will address those assignments of error out of order.

I

{¶ 7} In appellant's fourth assignment of error, he argues as follows:

{¶ 8} "Conner's right to due process of law was violated by the trial court because the trial was recorded on a malfunctioning tape recorder instead of using an official court reporter. As a result, important portions of the trial were not properly recorded and transcribed."

{¶ 9} Crim.R. 22 provides that in serious offense cases, "all proceedings shall be recorded." Because a serious offense includes "any felony" and the state charged appellant with committing numerous felonies, the court had a duty to

record the proceedings in this case. See Crim.R. 2(C). However, the appellant has the duty to provide a transcript for appellate review. *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, 15 O.O.3d 218, 400 N.E.2d 384. "This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." Id., citing *State v. Skaggs* (1978), 53 Ohio St.2d 162, 7 O.O.3d 243, 372 N.E.2d 1355; see also App.R. 9(B). "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." Id. at 199.

{¶ 10} When a complete transcript is not available, however, appellant has the option of providing a narrative statement of the proceedings, as provided for in App.R. 9(C), or an agreed statement, as provided for in App.R. 9(D). Finally, App.R. 9(E) makes provision for the correction or supplementation of the record when material omissions have occurred by "error or accident." See also *State v. Beltowski*, 11th Dist. No. 2006–L–032, 2007-Ohio-3372, 2007 WL 1881497.

{¶ 11} The malfunction of recording equipment in the trial court does not result in prejudice per se. See *State v. Ward*, 4th Dist. No. 03CA2, 2003-Ohio-5650, 2003 WL 22413424, ¶ 28; *State v. Drake* (1991), 73 Ohio App.3d 640, 647, 598 N.E.2d 115. In addition to demonstrating that the transcript is inadequate, appellant must also show that he was prejudiced by the faulty recordings. *Beltowski* at ¶ 28.

{¶ 12} In this case, appellant's trial was recorded, but only by an unmonitored and unreliable electronic recording system. As a result, significant gaps in the transcript exist. We are troubled by the fact that the missing transcript portions in this case involved essentially all of the testimony that supported appellant's defense. The fact that his only other witness was omitted entirely, without even a mention of her in the recording, indicates that major problems existed with the recording system used by the trial court. In addition, other smaller "inaudible" sections create the impression that the missing information in the transcript overall is pervasive.

{¶ 13} Nevertheless, pursuant to App.R. 9(C), appellant filed a supplemental statement of the missing testimony, which the trial court approved "after a review of the proceedings, pleadings, and personal notes taken during the course of the Trial." Further, the trial court's judgment entry states that "[a]ttorneys for the State and the Defendant have both agreed and stipulated that the proposed supplement to the record is 'materially accurate and complete,' and that it should and ought to be, 'admitted as part of the official record.' "

{¶ 14} Therefore, although we agree the trial court should take steps to ensure that recording equipment is working properly, the issue in this case has been resolved. Since appellant stipulated that the supplement to the record was accurate and complete, he may not now argue that the record is insufficient for this court to review or that he was prejudiced by the failure to record the omitted testimony.

{¶ 15} Accordingly, appellant's fourth assignment of error is not well taken.

## II

{¶ 16} In appellant's first assignment of error, he argues as follows:

{¶ 17} "The convictions for Burglary and Aggravated Burglary were legally insufficient because the Ex Parte Order issued when the divorce action was filed could not form a basis for burglary because it was civil in nature and not properly served on Conner. And, because there was no evidence offered that he intended to commit any criminal act while at the marital residence [sic]."

{¶ 18} Appellant essentially argues that an ex parte temporary civil order in a divorce action, which was not properly served, cannot be the basis for the trespass element in his convictions for burglary and aggravated burglary, as a matter of law. We agree.

{¶ 19} Whether evidence presented in a criminal case is "legally sufficient to sustain a verdict is a question of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In essence, sufficiency is a test of adequacy. Id. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Id. at 386–387, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶ 20} Domestic-relations courts issue temporary orders to assist parties in maintaining financial and other matters during the pendency of divorce proceedings. Those orders include temporary possession or use of the marital home and other property, temporary child and spousal support, and payment of bills. Since these are civil orders, the enforcement of such temporary orders is accomplished by the filing a motion for civil contempt against the noncompliant party. See *O'Grady v. O'Grady* (Jan. 18, 2002), 2d Dist. Nos. 01CA36, 01CA37, and 01CA52, 2002 WL 63309 (remedy for wife's failure to return property items under court's temporary order was to file charges in contempt).

{¶ 21} Under R.C. 3103.04, neither party to a divorce may be excluded from the marital home without an appropriate court order. R.C. 3103.04 was intended "to address property ownership rights of married persons [which are] matters of a civil nature. Privileges of a husband and wife with respect to the

property of the other were not meant to be enforced criminally and do not affect criminal liabilities." *State v. Lilly* (1999), 87 Ohio St.3d 97, 102, 717 N.E.2d 322.

{¶ 22} In the *Lilly* case, the wife had moved into her own separately leased residence, over which the defendant, the estranged husband, had no control or custody. Id. at 100. Thus, since the defendant never had a right to be in the wife's residence and had notice of that restriction, he was properly charged with burglary and unlawful entry when he entered her residence without the wife's permission and raped her. Id.

{¶ 23} Ordinarily, when one party fears intrusion and physical danger, a civil protection order may also be sought. Such an order serves as a preemptive measure to deter domestic violence by criminalizing any violation of its terms. *Toledo v. Lyphout,* 6th Dist. No. L-08-1406, 2009-Ohio-4596, 2009 WL 2855714, ¶ 15, citing *Parrish v. Parrish* (2002), 95 Ohio St.3d 1201, 1204, 765 N.E.2d 359. Before imposing criminal sanctions, however, civil protection order proceedings include mandatory due-process safeguards to provide notice to the respondent of the specific terms of the order, penalties that may be imposed, and a hearing that permits him to defend against alleged violations. Civ.R. 65(D) provides:

{¶ 24} "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be *specific in terms;* shall describe in *reasonable detail,* and not by reference to the complaint or other document, *the act or acts sought to be restrained;* and is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive *actual notice* of the order whether by personal service or otherwise." (Emphasis added.)

{¶ 25} Actual notice requires more than general knowledge that an order has been issued. *Midland Steel Prods. Co. v. U.A.W. Local 486* (1991), 61 Ohio St.3d 121, 126, 573 N.E.2d 98. "A court's order is an 'order' only to the extent of its terms. To know an order, one must know its terms." Id.

{¶ 26} In this case, appellant still had residual rights in the marital home and property within it, which were subject to further court order. His divorce attorney testified that the ex parte order was not the same as a protective order, and appellant was not represented by counsel when that order was granted.

{¶ 27} After considering the nature of the proceedings, we conclude that the temporary ex parte civil order issued pursuant to the initial filing of the divorce, which merely designated that S.C. had "exclusive use" of the marital home and included no other specific restrictions, was not sufficient to establish such "custody or control" as to allow for criminal trespass by appellant. Such temporary orders may be enforced by a motion for contempt or, in the alterna-

tive, by the filing of a civil protection order, which would then provide for criminal penalties if the order is violated.

{¶ 28} Moreover, nothing in the record indicates that appellant had actual notice that his presence in the marital home could constitute a criminal offense. No civil protection order or temporary restraining order existed that would have unequivocally provided notice to appellant of the possible consequences of entering the property or potential criminal penalties. Even local sheriff's deputies, when appellant was initially at the home to pick up belongings, did not indicate that he could be subject to criminal charges. Rather, they merely regarded the order as the typical preliminary divorce order and told him that he was to leave the premises. Therefore, under the facts of this case, the terms of the temporary ex parte civil order in the divorce action cannot be the sole basis for the burglary and aggravated-burglary charges.

{¶ 29} Accordingly, appellant's first assignment of error is well taken.

## III

{¶ 30} Appellant's second assignment of error is as follows:

{¶ 31} "The convictions were against the manifest weight of the evidence."

{¶ 32} Since we have already determined that appellant could not be charged with burglary or aggravated burglary on the basis of the temporary ex parte order, we need not analyze those convictions under the manifest-weight-of-the-evidence standard. We will, therefore, now address the remaining conviction for rape.

{¶ 33} When warranted, under a manifest-weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact-finder's resolution of the conflicting testimony. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 34} An appellate court, " 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id. at 386, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 35} Although we may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is still primarily an initial determination for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39

O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80–81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 36} Appellant was indicted under R.C. 2907.02(A)(2), which provides:

{¶ 37} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 38} " 'Sexual conduct' means vaginal intercourse between a male and female; * * * fellatio * * * between persons regardless of sex. * * *." R.C. 2907.01(A). " 'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 39} When a defendant uses force or threats of force to engage in sexual conduct with his spouse while a divorce action is pending, a conviction for rape pursuant to former R.C. 2907.02 will be sustained. See *State v. Clark* (1988), 43 Ohio App.3d 104, 539 N.E.2d 702.

{¶ 40} In this case, appellant acknowledges that sexual conduct, which in part forms the basis for appellant's conviction, occurred between appellant and his wife. The main issue is whether that conduct was consensual or whether it was the result of force or threats of force. The following testimony and evidence was presented at trial.

{¶ 41} Appellant's wife, S.C., testified that on the evening of December 7, 2006, she returned to the residence after driving the couple's three sons home from their sports games or practices. Because appellant had telephoned during the time that the boys were at these events, S.C. had one of their sons call him back after his basketball game had ended. Appellant allegedly was angry and yelled at S.C. because he was not able to speak with his children at the scheduled time—6:00 to 8:00 p.m. S.C. returned home with all three boys at 9:30 p.m. She then had another son call for his phone visit with appellant, who was still agitated. Eventually, S.C. and the boys went to bed for the night.

{¶ 42} At about midnight, S.C. awoke in her upstairs bedroom to find appellant lying on top of her. Her then seven-year-old son was in bed next to her. S.C. testified that she was afraid and tried to awaken that son. Appellant told him to

go back to sleep, which he did. At S.C.'s request, appellant permitted her to go downstairs to let the dog out and then to go to the bathroom on the main floor. Although S.C. shut the door, appellant allegedly entered the bathroom and pushed her down onto her knees. S.C. testified that appellant then tried several times to get her to perform oral sex, grabbing her head and moving it from side to side.

{¶ 43} Appellant then pushed S.C. over the edge of the tub, and "was going to try and do something." She put her hands behind her and asked him to stop. Appellant then allegedly put his hand over her mouth and pushed her up against the window. S.C. heard the dog barking to be let in, and, eventually, appellant let her go. While appellant went to let the dog in, S.C. went to the garage, got into and tried to start the car, and tried to open the garage door so she could leave.

{¶ 44} A physical altercation between S.C. and appellant then occurred in the garage. S.C. alleged that appellant physically and sexually accosted her, grabbing and twisting her breasts with his hand while trying to drag her out of the vehicle.[1] Eventually, appellant took S.C. back into the house and into the basement. Appellant then took her to a couch and asked her whether she wanted to have sex. S.C. testified that she did not say anything, but sat on the couch crying and shaking. She said that she could hardly lift her head because it hurt. Appellant then told her that he had planned to have sex with her on the weekend, to chain her to the bed, and then to take sleeping pills so that she would have to watch him die.

{¶ 45} S.C. said that at this point, she stopped fighting and lay on the couch, letting appellant do what he wanted. She said that she was afraid, did not want to get hurt anymore, and wanted to calm appellant down because he was so angry. Appellant then had vaginal sexual intercourse with her. Afterward, when S.C. told him that she was cold and was shaking, appellant covered her legs with a sweatshirt. He then said that they could go back upstairs, where he wanted to have sex again. Appellant put a blanket on the couch in the basement, however, lay down on it, and asked S.C. to lie down with him. She complied, and after some time, appellant, who had been drinking, passed out and went to sleep. Eventually, she was able to move his arm, which was over her, and get up; but she feared he would wake up.

{¶ 46} S.C. then went upstairs, called 9-1-1 for help, unlocked the front door so the deputies could get in, and went back up to the second floor of the home to await their arrival. At this point in the trial testimony, a recording of S.C.'s 9-1-

---

1. The other rape charge related to the incident in the garage. Since the jury found appellant "not guilty" on that count, however, we omit the details of that event.

1 call to the sheriff's office was played for the jury. S.C. stated that when the deputies arrived, appellant was arrested and removed from the basement, where he had been sleeping. She said that she then came downstairs and asked the deputies to be quiet while they investigated, so her children would not wake up. S.C. also went to the hospital, where an examination and rape kit were performed and photographs were taken. Photographic evidence of injuries to S.C.'s face, breasts, and buttocks was also presented.

{¶ 47} On cross-examination, S.C. acknowledged that although she had screamed and honked the horn on her car, none of her children awoke. She explained that noise in the basement could not be heard up in the bedrooms of the second story of the house.

{¶ 48} Two deputies testified regarding S.C.'s demeanor and appellant's appearance when they arrived at the house around 3:30 a.m. on December 8. Fulton County Deputy Max Nofziger stated that S.C. appeared "frantic," looked like she had been crying, and was shaking and trembling. As he took her statement, she began to cry again. S.C. drove herself to the hospital, and Nofziger followed her there in his cruiser.

{¶ 49} Deputy Rick Brock stated that he and Nofziger found appellant naked and asleep on a couch in the home, covered by a blanket. Appellant smelled of alcohol, acted groggy, and was not compliant with the deputies' commands. The deputies then removed the blanket and told him to put on his clothing, which was on the couch. Appellant was arrested and handcuffed.

{¶ 50} Chief Deputy Roy Miller testified that he investigated the scene where the incidents took place. He took photos of the home's interior and gathered physical evidence, including a rug and the blanket that had covered appellant. Miller stated that he also spoke with appellant the next day, while he was in jail. Appellant denied raping or having sexual intercourse with S.C., but said that he did perform oral sex on her. Miller stated that in addition to the rape kit performed at the hospital on S.C., oral, fingernail, and penile DNA swabs, hair samples, and underwear from appellant were collected and submitted for testing at the Ohio Bureau of Criminal Identification and Investigation ("BCI").

{¶ 51} Julie Cox, a forensic scientist with the BCI, testified regarding the test results on the items submitted. She tested the vaginal swab from S.C., but did not find sufficient detectable male DNA, even though semen was detected during the forensic biology examination. Test results from appellant's penile swabs, however, showed a mixture of DNA consistent with contributions from both S.C. and appellant. Testing performed on a fingernail on appellant's right hand also showed a mixture, with the major profile being S.C. and the minor profile consistent with appellant. Cox testified that a swab from the front panel of appellant's underwear also contained DNA from S.C. No testing was performed

on the rug or blanket. Cox acknowledged that the specific source fluid from S.C. for DNA testing could not be determined, only that the presence of S.C.'s DNA was confirmed on the penile, fingernail, and underwear swabs.

{¶ 52} In rebuttal to this evidence, appellant testified that on the evening of December 7, 2006, he was at a local restaurant. He said he was supposed to have visitation with his sons, but his wife had not called him back about making arrangements. He stated that he had also previously opposed S.C.'s plans to take the boys to Missouri for the holidays. Appellant testified that S.C. said they could not resolve the issue over the phone, and suggested that he come to the house to talk. Although he was aware of the ex parte order giving S.C. the right to live in the marital home, appellant stated that he believed that he could come to the home at S.C.'s invitation.

{¶ 53} Appellant said that he arrived at the marital residence around 10:30 or 11:00 p.m. According to appellant, he entered the house through the garage door, which was wide open, and went into the kitchen, where he was greeted by S.C., who was sitting at the kitchen table. He said that they had a friendly conversation about the upcoming Christmas and the visitation issue. According to appellant, S.C. was unhappy with him because he had refused her request and she was trying to convince him to change his mind. He said that S.C. also asked him to look at the water pump and softener in the basement, because they were not working properly.

{¶ 54} Appellant said that from there, the couple went down to the basement where the pump and softener were located. He denied "dragging" her from the garage to the basement. Appellant said that he and S.C. then engaged in consensual sex on a couch in the basement. He testified that he pulled S.C.'s pants off but did not remove her top. He stated that he performed oral sex but could not explain why his DNA was not found on her vaginal swab. He said that he removed all his clothes and they then had consensual intercourse.

{¶ 55} Appellant said that S.C. never complained about being in pain, but he also could not explain the injuries to her buttocks, breasts, and lip area shown in photos taken at the hospital. He denied that the altercation in the car and garage had occurred or that he had caused any injuries to S.C. Appellant acknowledged having consumed "a beer or two with dinner" before going to the residence. He denied that he was ever upstairs in her bedroom that evening or that the presence of S.C.'s DNA under his fingernails was caused by any struggle with her. Appellant also denied being in the bathroom or trying to make her perform oral sex on him. Appellant said that during the questioning after his arrest, he did tell Deputy Miller that he had consensual sex with S.C. Appellant said when he initially denied having sex with S.C., he understood it to mean sex with a "rape context."

{¶ 56} Our review of the record reveals that the rape conviction turned on the credibility of the witnesses. Nothing indicates that the jury lost its way or that a miscarriage of justice occurred. Therefore, we cannot say that the jury's verdict was against the manifest weight of the evidence.

{¶ 57} Accordingly, appellant's assignment of error as to the rape conviction is not well taken and is moot as to the aggravated-burglary and burglary convictions.

IV

{¶ 58} In his third assignment of error, appellant argues the following:

{¶ 59} "The trial court improperly made findings of fact in imposing Conner's sentence, and his sentence was otherwise unconstitutional or was an abuse of discretion by the trial court."

{¶ 60} Appellant's argument centers mainly around the imposition of consecutive sentences. Since the convictions for burglary and aggravated burglary are now vacated, those sentences are also vacated. Consequently, appellant's argument is moot as to consecutive sentences.

{¶ 61} Regarding the remaining sentence for rape, in reviewing a felony sentence, an appellate court employs a two-pronged analysis. First, the court must "examine the sentencing court's compliance with all applicable rules and statutes * * * to determine whether the sentence is clearly and convincingly contrary to law." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 4. If the first prong is satisfied, then the trial court's decision is reviewed under an abuse-of-discretion standard. Id. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 62} In determining the discretion factor, mandatory judicial fact-finding has been eliminated. See *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. Accordingly, post-*Foster*, trial courts " 'are no longer required to make findings or give their reasons for imposing maximum, consecutive or more than the minimum sentence.' " (Emphasis omitted.) *Kalish* at ¶ 11; *Foster* at paragraph seven of the syllabus. However, the trial court must still consider the factors set forth in R.C. 2929.11 and 2929.12 before imposing a sentence. *Kalish* at ¶ 13, citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38. R.C. 2929.11 and 2929.12 are not fact-finding statutes, but rather they "serve as an overarching guide for trial judges to consider in fashioning an appropriate sentence." *Kalish* at ¶ 17.

{¶ 63} For his rape conviction, appellant was sentenced to five years of imprisonment. Under R.C. 2929.14(A)(2), a first-degree felony, a court may impose a prison term of "three, four, five, six, seven, eight, nine, or ten years." In its sentencing entry, the court specifically stated that it had considered "the record, oral statements, any victim impact statement and presentence report, as well as the principles and purposes of sentencing under R.C. 2929.11" and that it had "balanced the seriousness and recidivism factors under R.C. 2929.12." The court further found that "a prison term is consistent with the purposes and principles of sentencing set forth in section 2929.11" and that appellant was not amenable to an available community-control sanction. After considering factors under R.C. 2929.13(B), the court found that appellant caused physical harm to another person and that he had previously served a prison term.

{¶ 64} Upon consideration of the record, we conclude that appellant's sentence for the rape conviction is not contrary to law nor an abuse of discretion. Although not the minimum, the five-year sentence is mid-range, with the maximum set at ten years. In addition, since appellant was not a first-time offender and the facts indicated that physical harm was done to the victim, we cannot say that the trial court abused its discretion.

{¶ 65} Accordingly, appellant's third assignment of error is not well taken as to the sentence for his rape conviction and is moot as to the burglary and aggravated-burglary sentences.

{¶ 66} The judgment of the Fulton County Court of Common Pleas is affirmed as to the rape conviction and sentence and reversed on the burglary and aggravated-burglary convictions. The convictions and sentences for the burglary and aggravated-burglary offenses are hereby vacated. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed in part
and reversed in part.

Osowik, P.J., and Handwork, J., concur.