OPINION
{¶ 1} This appeal arises from business dealings gone awry between two former best friends, plaintiff-appellee, Lynn Edelman ("Edelman"), and defendant-appellant, Scott A. Rubin ("Rubin"). In their halcyon days, Edelman and his wife Sheryl, and Rubin *Page 2 
and his wife Julie, socialized frequently. Over time, as the friendship developed, Rubin and Edelman began to do business together. Ultimately, their business dealings involved millions of dollars in assets.
 {¶ 2} Rubin's background was in real estate and construction. After college, Rubin began working for the Wallick Construction Company, a/k/a Wallick Company ("Wallick"). Wallick owned and operated Gemstar Homes as a production home-building company. In 1981, Rubin married Julie Wallick, the daughter of Jack Wallick. Rubin purchased from Wallick a number of "spec" homes through a limited partnership, Sculie Properties ("Sculie"), of which Rubin was the general partner. In the early 90's, Rubin formed S.A.R. Construction ("SAR Construction"), acquired the trade name "Gemstar Homes," and began constructing single family homes and condominiums.
 {¶ 3} Edelman was a sophisticated stock market investor who worked in his family owned business, Edco Tools, a wholesaler and retailer of industrial tools, supplies, and machinery. In 1997, Edelman left Edco Tools and formed Columbus Lumber, a/k/a Columbus Supplies, a wholesaler of lumber and lumber supplies, tools, machinery, and equipment.
 {¶ 4} Edelman and Rubin began making construction and real estate deals in the early 1990s. In 1995, Edelman purchased a 50 percent interest in SAR Construction. Numerous corporate entities were formed for, among other things, acquiring and developing property for commercial and residential purposes, financing construction of homes and condominiums, managing property, and building HUD financed apartments. Edelman invested in a number of these entities. Rubin characterized Edelman's primary *Page 3 
involvement as a passive investor who provided capital and a co-maker on various financings, while Rubin controlled the entities.
 {¶ 5} On March 4, 1997, Rubin and his wife Julie separated. In the case on appeal before us, the trial court found that the subsequent divorce proceedings were protracted and contentious. The trial court found that the fallout from the separation and divorce adversely impacted the business relationship between Rubin and Edelman. Social contacts and friendship dwindled and deteriorated.
 {¶ 6} The divorce also triggered changes in the way Rubin did business. The trial court found that Rubin took steps to restructure and/or wind down certain companies in which both Rubin and his wife held interests. For example, Rubin transferred the business, operations, and capital of SAR Building Company into a new company, SARBG which was wholly owned by Rubin. SARBG served as the general contractor on HUD-financed apartment projects. Rubin refused to allow Edelman an opportunity to participate in SARBG.
 {¶ 7} On August 23, 1999, appellees Lynn Edelman and Columbus Homes, Inc. (a corporation controlled by Edelman), proceeding individually and derivatively on behalf of SAR Construction Co., Rubel Construction Co., Zansco, Ltd., SAR Properties, Inc., Lease All Leasing Company, and Lynsco, filed suit against Scott Rubin and various entities which Rubin owned or controlled for misappropriation of corporate opportunities, breach of fiduciary duty, and other claims based upon the actions taken by Rubin in his role as controlling shareholder and controlling partner in business ventures held jointly by Rubin and Edelman. The original defendants were Scott Rubin, Sculie Properties, Sculie *Page 4 
Properties Limited Partnership, Mitran Land, LLC, Scott Rubin Construction Co., S.A.R. Building Group, Inc., and Village Holding Company, Ltd. Nominal defendants were SAR Construction Co., Rubel Construction Co., Zansco, Ltd., SAR Properties, Inc., and Lease All Leasing Company.
 {¶ 8} Shortly before the liability phase of the trial was to commence, appellees filed a motion to add Rubin Properties, Inc., SARBG London, Ltd., SARBG Delaware, Ltd., and Kennedy Road, Ltd., SARBG Marysville, Ltd., and SAR Construction Rentals, as additional party defendants. Appellees' basis for the motion was that Rubin had breached his fiduciary duty by creating additional entities that usurped corporate opportunities from appellants.
 {¶ 9} The trial court deferred ruling on the motion until after the liability hearing. In the liability decision rendered on June 10, 2003, the trial court granted appellees' motion as to Rubin Properties, SARBG London, Ltd., SARBG Marysville, Ltd., SARBG Delaware, Ltd., and Kennedy Road, Ltd., finding that the new parties were part of appellees' corporate opportunity claims (hereafter, "Supplemental Defendants"). Service of process was never perfected upon these entities.
 {¶ 10} In December 2001, after the liability hearing had concluded, but before the trial court issued its decision, appellees filed another motion to add additional parties. Believing that Rubin had created another wave of business entities on the eve of trial to evade liability, appellees filed a second motion to add additional party defendants S H Construction, LLC, Soho Construction, LLC, Soho Enterprises, LLC, Soho Financing, LLC, Soho Fitness, LLC, Soho Management, LLC, Soho Marysville, LLC, Soho Offices, *Page 5 
LLC, and Soho Warehouse, LLC (collectively "Soho entities"). The trial court denied this motion.
 {¶ 11} On June 10, 2003, the trial court issued its decision on liability. The trial court found Rubin liable for breaches of fiduciary duty, including self-dealing, misappropriation of corporate opportunities, misappropriation of funds and assets, and breaches of the duty of good faith and disclosure. The trial court found that Rubin had facilitated his misappropriations by creating a series of shell entities to usurp or take advantage of appellees' corporate opportunities.
 {¶ 12} The trial court imposed a constructive trust in favor of SAR Construction and ordered an accounting of the various entities' books and records. The accounting was necessary for the damages phase of the case, in particular, because the trial court found Rubin's financial statements and bookkeeping to be abysmal.
 {¶ 13} Prior to the damages phase, the trial court found Rubin in contempt for violating a court order that had instructed him to produce financial information requested by Edelman. In yet another contempt action, Rubin was found in contempt for transferring assets in violation of a court order and for failing to provide the outside accounting firm with access to records.
 {¶ 14} The trial court conducted a damages hearing in December 2005. After the hearing, but before the trial court entered final judgment, Rubin and various Rubin entities filed for Chapter 11 bankruptcy in Arizona. The bankruptcy court granted relief from the automatic stay effective June 1, 2006. Following this action, the trial court issued findings of fact, conclusions of law, and a final judgment entry on June 23, 2006. *Page 6 
 {¶ 15} The trial court found Rubin and the defendant entities liable for damages in excess of $19 million, including $2.1 million in punitive damages. In addition, the trial court imposed a constructive trust on various Rubin entities including the Soho entities, which had never been brought in as parties in the case. Finally, the trial court permanently enjoined appellants and the Soho entities from transferring or disposing of any assets without approval of the bankruptcy court or the trial court. The provisions of the injunction concerning the constructive trust and the permanent injunction are at issue in this appeal.
 {¶ 16} Appellants have assigned the following as error:
 [I.] The trial court erred by issuing the injunction.
 [II.] The trial court erred by entering judgment and awarding damages against entities that were never made parties.
 [III.] The trial court erred by imposing a constructive trust on assets owned by non-parties.
 [IV.] The trial court erred by ordering Mr. Rubin to disgorge salary paid to him by one of the Defendants in the absence of a finding that he was disloyal to that company.
 [V.] The trial court erred by finding that Mr. Rubin misappropriated a corporate opportunity from S.A.R. Construction.
 [VI.] The punitive damages award denied Mr. Rubin's right to due process.
 {¶ 17} In his first assignment of error, Rubin argues that the injunction is overly broad in that it precludes him from ever working again. Rubin claims that he has years of accumulated experience in the construction industry much of it learned outside of his fiduciary role in SAR Construction. Rubin argues that he should not be precluded from *Page 7 
using that knowledge for his own benefit instead of being forced to work in perpetuity for Edelman and never being allowed to transfer assets.
 {¶ 18} Edelman contends that the injunction is not overbroad because it is crafted to prevent Rubin and his entities from continuing to dispose of assets traced directly to Rubin's misappropriations.
 {¶ 19} Civ.R. 65 governs the extraordinary remedy of injunctive relief and is modeled after the corresponding federal rule. Civ.R. 65(D) provides as follows:
 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise.
 {¶ 20} A trial court has discretion in framing an injunction, and the reviewing court should only interfere when there has been an abuse of discretion. State ex rel. Fisher v. Renters' Assistance Foundation,Inc. (Sept. 14, 1993), Franklin App. No. 92AP-1590.
 {¶ 21} The injunction appellants claim is overbroad provides in pertinent part that, absent an explicit order by the bankruptcy court or the trial court, "Rubin individually or in concert with others" and his numerous entities are "permanently enjoined that they shall not transfer or otherwise dispose of any assets." (Final Judgment Entry, at 5.)
 {¶ 22} On its face, the injunction does not prohibit Rubin from ever working again. Rather, it prohibits him from transferring assets without court approval. Rubin has a judgment against him for over $19 million. Because he egregiously breached his *Page 8 
fiduciary duty, he is enjoined from disposing of assets arising out of his business ventures with Edelman. In addition, prior to the issuance of the injunction, Rubin was found in contempt for transferring assets, the very behavior sought to be enjoined here. Thus, it was eminently reasonable for the trial court to enjoin Rubin from actions he had already taken in violation of a court order. Certainly, if or when Rubin pays the judgment against him or as part of a payment plan, Rubin can petition the court to allow him to dispose of assets or to have the injunction lifted. In brief, appellants have overstated their over breadth argument.
 {¶ 23} Appellants next argue that it was error to issue an injunction when there was not irreparable harm and where money damages were an adequate remedy at law. Appellant contends that the award of money damages is an adequate remedy at law, and therefore the injunction should not have been issued.
 {¶ 24} Appellees cite to this court's opinion in Ohio Water Dev. Auth.v. Western Res. Water Dist., Franklin App. No. 05AP-954, 2006-Ohio-2681, for the proposition that a court can issue both monetary and injunctive relief. In Ohio Water, the local water district was a shell entity with no revenue or resources from which to repay a loan made by the Ohio Water Development Authority ("OWDA"). The OWDA sought repayment of the principal and interest, attorney fees and costs, an order restraining Western Reserve Water District ("Western Reserve") from dissolving as an entity until it had satisfied its debt, and an injunction restraining the individual trustees from resigning their positions without insuring that a replacement would be in place. Western Reserve appealed the judgment of the trial court that granted the requested relief on the grounds that it was *Page 9 
error for the trial court to award both monetary and injunctive relief. Western Reserve asserted that it was error to resort to equitable remedies when the award of monetary damages had not been definitively demonstrated to be inadequate. Id. at ¶ 7.
 {¶ 25} This court found no abuse of discretion in supplementing the award of monetary damages with further equitable relief. This court held that merely computing the amount of monetary damages would not reasonably lead toward their payment, and that a trial court may fashion a suitable equitable remedy "to ensure both that the damages are awarded in the correct amount and that there exists some reasonable mechanism by which they may some day be paid." Id. at ¶ 10.
 {¶ 26} The same logic applies here. In addition to the breaches of fiduciary duty that underlie the monetary award in this case, Rubin has demonstrated a propensity for disregarding court orders and transferring assets to avoid accountability for his actions. Without the injunction to ensure that Rubin did not avoid paying the judgment by creating yet another wave of business entities and transferring or disposing of assets, appellants did not have an adequate remedy at law. Therefore, it was not error for the trial court to enter both injunctive and monetary relief.
 {¶ 27} Appellants next argue that it was a denial of due process to enjoin the non-parties who were never served and who never had notice and an opportunity to be heard.
 {¶ 28} Appellees urge this court to view the Soho entities as non-party business entities that are controlled by Rubin who is likely to use them in furtherance of his wrongful conduct. Appellees contend that an injunction is valid against a non-party aider and abettor, so long as the party has actual notice of its terms. Appellants cite toFisher, *Page 10 
supra, for the proposition that an injunction may properly apply to a non-party corporation, partnership or association if it is acting in concert and participation with the defendants directly or indirectly.
 {¶ 29} In Fisher, the appellants attacked the breadth of an injunction forbidding certain deceptive sales practices committed by the appellants. The injunction encompassed the appellants, their agents, servants, representatives, salespersons, employees, successors and assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership, or association. Id. The appellants sought to have the injunction modified because it appeared to bind individuals who may have some affiliation with appellants but may not have been aware of the injunction because they were not parties to the proceeding. This court found that the injunction was not overbroad in that there was no evidence indicating that the trial court had attempted to enforce the injunction against an improper individual. Id.
 {¶ 30} In addition, the Supreme Court of Ohio has held that nonparties may be bound by an injunction to ensure that the defendants do not nullify the decree by carrying out prohibited acts through aiders and abettors, even though the aiders and abettors were not parties to the original proceeding. Planned Parenthood Ass'n. of Cincinnati, Inc. v.Project Jericho (1990), 52 Ohio St.3d 56, 61. Those persons must have actual notice of the injunction in order to be bound by it. Id. However, the action in Planned Parenthood, was an action in contempt against the nonparties who were alleged to have violated the injunction. In the contempt action, the trial court found that the appellants all had actual *Page 11 
notice of the injunction and intentionally violated it by acting collectively to prevent a clinic from providing medical services.
 {¶ 31} The issue presented by this case is distinguishable from bothFisher and Planned Parenthood. First, the trial court's injunction specifically names the non-party Soho entities as bound by the injunction without ever having giving them notice or an opportunity to be heard. Second, the action in Planned Parenthood was a contempt action brought after the protesters had violated the terms of the injunction.
 {¶ 32} Binding nonparties to an injunction without notice and a right to be heard presents significant due process concerns. A fundamental principal of due process is notice and an opportunity to be heard. As the United States Supreme Court has held: "An elementary and fundamental requirement of due process in any proceeding * * * is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank Trust Co. (1950),339 U.S. 306, 314, 70 S.Ct. 652. "Both the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution guarantee due process of law, and thus guarantee `a reasonable opportunity to be heard after a reasonable notice of such hearing.'" Ohio Valley Radiology Associates, Inc. v. Ohio Valley Hosp.Ass'n. (1986), 28 Ohio St.3d 118, 125, quoting State ex rel. AllstateIns. Co. v. Bowen (1936), 130 Ohio St. 347, paragraph five of the syllabus.
 {¶ 33} Here, it is undisputed that the Soho entities were never made parties to the action. Although injunctions issued both in the federal courts and the Ohio courts are *Page 12 
binding not only on the parties, but also those persons "in active concert or participation with them who receive actual notice of the order by personal service or otherwise," Fed.R.Civ.P. 65(d); Civ.R. 65(D), it is error to enter an injunction against a nonparty without having made such a determination in a proceeding in which the person or entity was a party. Zenith Radio Corp. v. Hazeltine Research, Inc.
(1969), 395 U.S. 100, 112, 89 S.Ct. 1562. See, also, 11A Wright, Miller Kane, Federal Practice and Procedure, Section 2956 (stating that "[a] court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction").
 {¶ 34} The appropriate means to pursue a nonparty who is alleged to have violated an injunction is an action in contempt. "Courts have carefully distinguished between entering an injunction against a non-party, which is forbidden, and holding a non-party in contempt for aiding and abetting in the violation of an injunction that has been entered against a party, which is permitted." Additive Controls Measurement Systems, Inc. v. Flowdata, Inc. (1996), 96 F.3d 1390, 1395.
 {¶ 35} In Midland Steel Prods. Co. v. U.A.W. Local 486 (1991),61 Ohio St.3d 121, 123, Midland Steel filed a "charge of contempt and/or motion for order to show cause" against union members who allegedly violated a temporary restraining order by threatening or intimidating persons leaving or entering the Midland Steel facility. The Supreme Court of Ohio held that a nonparty may be found in contempt for violating an injunction by aiding and abetting a party who violates an injunction if that person had actual notice of the injunction. Id. at 126. Initiating an action in contempt satisfies the *Page 13 
requirements of due process because it gives the alleged contemnor an opportunity to appear and defend against the charges, including the issue of notice.
 {¶ 36} The same analysis applies to appellant's arguments that the Soho entities cannot be enjoined because they are not officers, agents, servants, employees, or attorneys of a party, that they are not in active concert with a party, and they are not in privity with a party pursuant to Civ.R. 65(D). There is no evidence on these issues because the Soho entities have never been joined as parties, served with process, and given an opportunity to defend against these allegations. In an action for contempt, appellees may be able to establish that the Soho entities are simply another round of shell companies created, controlled, and owned by Rubin to escape liability. However, those determinations must await another day.
 {¶ 37} Therefore, the first assignment of error is overruled in part and sustained in part to the extent that it was a violation of due process to enjoin the Soho entities when they were not parties and had no opportunity to be heard.
 {¶ 38} In their second assignment of error, appellants assert that the trial court erred by entering judgment and awarding damages against entities that were never made parties. Appellants argue that the decision adding the Supplemental Defendants, Rubin Properties, SARBG Delaware, Ltd., SARBG London, Ltd., SARBG Marysville, Ltd., and Kennedy Road, Ltd., was never separately journalized. In addition, appellants assert that the Supplemental Defendants and the Soho entities were never served with original process or summons, and therefore the trial court lacked personal jurisdiction over them. *Page 14 
 {¶ 39} Appellees respond that the original defendants' counsel never raised the defense of lack of personal jurisdiction due to failure of service, and therefore waived the defense of failure of process. Appellees contend that the Supplemental Defendants were joined by an express court order, and moreover they assented to and actively participated in the trial court proceedings for three years after the liability decision. Accordingly, appellees claim the Supplemental Defendants have waived their right to challenge the entry of judgment against them. Appellees do not challenge the argument that the Soho entities were never served, never voluntarily submitted to the trial court's jurisdiction, and never participated in the litigation. Thus, we continue our analysis and discussion with respect to the Supplemental Defendants only.[1]
 {¶ 40} The Supreme Court of Ohio has held that a court acquires personal jurisdiction over a party in one of three ways: (1) proper and effective service of process, (2) voluntary appearance by the party, or (3) limited acts by the party or their counsel that involuntarily subject them to the court's jurisdiction. Maryhew v. Yova (1984),11 Ohio St.3d 154, 156.
 {¶ 41} In Maryhew, service was not perfected upon the defendant, there was no written waiver of service, and there was no voluntary entry of appearance on behalf of the defendant by means of an entry of the court, or a responsive pleading. The Supreme Court of Ohio had to determine whether two requests by defendant's counsel for leave to *Page 15 
move or otherwise plead constituted a waiver of the affirmative defense of lack of personal jurisdiction over the defendant.
 {¶ 42} The Supreme Court of Ohio held that such acts did not constitute a waiver of the jurisdictional defense. The court acknowledged that there "may be some indicia of legal gamesmanship on the part of the defendant and her counsel, in knowing of, but not entering an appearance in the action[.]" Id. at 159. Nevertheless, the court held that the duty of perfecting service was upon the plaintiffs, and service had not been timely perfected. Therefore, the trial court was correct in granting a motion to dismiss based on the running of the statute of limitations.
 {¶ 43} Here, the parties do not dispute that service of process was never perfected on the Supplemental Defendants. Appellees have not pointed to any evidence in the record that appellants' counsel entered an appearance on behalf of the Supplemental Defendants. The question therefore becomes whether the Supplemental Defendants or their legal representative have waived the defense of lack of jurisdiction over the person by their participation in the litigation.
 {¶ 44} In Harris v. Mapp, Franklin App. No. 05AP-1347, 2006-Ohio-5515, this court stated: "Where a defendant appears and participates in the case without objection, he waives the defense of lack of personal jurisdiction due to failure of service." Id. at ¶ 11.
 {¶ 45} In the case before us, the trial court entered a "stand still" order on September 6, 2002, after the liability phase had been concluded but before transcripts and post trial briefs had been filed. Appellants' trial counsel signed that order which bound all the original defendants as well as the Supplemental Defendants with the *Page 16 
exception of SARBG Marysville. In appellants' proposed findings of fact and conclusions of law, filed on July 15, 2002, appellants' counsel provided proposed findings that the Supplemental Defendants should not be joined and that they were not in the same line of business as SAR Construction. This participation in the litigation waived any objection to lack of personal jurisdiction based on failure of service.
 {¶ 46} Therefore, the judgment entered against the Soho entities must be vacated for lack of personal jurisdiction. However, with respect to the Supplemental Defendants, the argument is not well-taken. The second assignment of error therefore, must be sustained in part and overruled in part.
 {¶ 47} In their third assignment of error, appellants assert that for essentially the same reasons it was error to issue an injunction to nonparties, it was also error for the trial court to impose a constructive trust on assets owned by nonparties. Appellants cite federal cases and bankruptcy cases for the proposition that the trial court had no power to impose a constructive trust on assets belonging to a nonparty because the court did not have jurisdiction over the nonparty.
 {¶ 48} Appellees argue that the law in Ohio is otherwise. Appellees assert that, under Ohio law, a constructive trust is properly imposed upon assets that rightfully and equitably belong to a plaintiff, even when those assets are currently in the possession of a third party. Appellees cite to an Ohio case, Dolce v. Lawrence (Dec. 22, 1995), Lake App. No. 95-L-038 ("Dolce I") for the proposition that the remedy of a constructive trust extends to all entities formed or created with the misappropriated assets. *Page 17 
 {¶ 49} A constructive trust is a remedy applied for purposes of restitution to prevent unjust enrichment. Groza-Vance v. Vance,162 Ohio App.3d 510, 2005-Ohio-3815. It is an equitable doctrine. Id. InDolce I, the Eleventh District Court of Appeals stated that, in an action imposing a constructive trust, the determination of the status of the property in dispute is an in rem action and, therefore, it is irrelevant whether the constructive trust was imposed upon funds held by a person who was not made a party to the proceedings. However,Dolce I was superseded by Dolce v. Lawrence, Lake App. No. 96-L-129 ("Dolce II"), in which the Court of Appeals for Lake County reversed course, holding that the judgment entry imposing a constructive trust upon fraudulently transferred funds was actually an attempt by the trial court to impose a personal judgment on a third party over whom the trial court lacked personal jurisdiction.
 {¶ 50} The same situation applies to the present case. The trial court imposed a constructive trust over assets held by the Soho entities who were not made parties to the case. We recognize that the trial court found that "between during [sic] the liability and damages trials, Mr. Rubin cavalierly transferred assets from Scott Rubin Construction to brand new entities literally created only on the eve of trial." (Final Findings of Fact and Conclusions of Law of June 23, 2006, at ¶ 63.) Thus, the trial court was trying to fashion a remedy that would not reward Rubin for his misappropriation of corporate opportunities and breach of fiduciary duty. However, the lack of personal jurisdiction over the Soho entities is fatal to appellees' argument. SeeGroza-Vance, supra (a court may exercise its in personam jurisdiction to order a party to convey property located out of state). The third assignment of error is well-taken and sustained. *Page 18 
 {¶ 51} In their fourth assignment of error, appellants contend that there was no evidence to support the trial court's order that Rubin disgorge his compensation from SARBG. With respect to SAR Construction, the trial court made a finding that Rubin was a faithless servant. Appellants argue that the trial court made no such finding with respect to SARBG and, therefore, the disgorgement order was not supported by the evidence.
 {¶ 52} In this assignment of error, appellants have asked us to review the trial court's factual findings. It is well established that "[judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, syllabus. The faithless servant doctrine states that an agent is entitled to no compensation for conduct which is disobedient or a breach of his duty of loyalty. Financial Dimensions, Inc. v. Zifer (Dec. 10, 1999), Hamilton App. No. C-980960.
 {¶ 53} Here, during the liability portion of the case, the trial court specifically found that "Rubin misappropriated a corporate opportunity of SAR Construction in forming and operating SARBG and the SARBG limited partnerships." (June 10, 2003 Decision, at 65.) The trial court also expressly found that "Rubin acted willfully and maliciously in breaching his fiduciary duties." (Final Findings of Fact and Conclusions of Law of June 23, 2006, at ¶ 64.) The very act of forming and operating SARBG was a misappropriation of corporate assets, misappropriation of a corporate opportunity, and a breach of Rubin's duty to appellees. Rubin should not be allowed to profit from these activities. Moreover, Rubin *Page 19 
utilized the goodwill of SAR Construction in securing a line of credit to meet HUD requirements for work undertaken by SARBG. Rubin also utilized a bond written by Mid-State Surety for SAR Construction to meet HUD contract requirements for SARBG. (June 19, 2003 Decision, at 44.) SARBG's ability to conduct business was founded on Rubin's misappropriation and self-dealing. The trial court's factual determinations are more than ample to support the judgment of the trial court.
 {¶ 54} The fourth assignment of error is not well-taken and is overruled.
 {¶ 55} In their fifth assignment of error, appellants contend that it was error for the trial court to find that Rubin misappropriated a corporate opportunity from SAR Construction.
 {¶ 56} Misappropriation of a corporate opportunity occurs when an officer or director of a corporation acquires (1) information about a business opportunity, (2) in his fiduciary capacity, and (3) the opportunity is in the corporation's line of business. Michals Enterpr.,Inc. v. Alexandrou (Nov. 21, 1984), Cuyahoga App. No. 48016; Hubbard v.Pape (1964), 2 Ohio App.2d 326, 329.
 {¶ 57} Appellants assert that Rubin did not learn of the HUD construction opportunities in his fiduciary capacity, and that building multi-family apartment complexes is not the same line of business as building single family homes.
 {¶ 58} Appellants refer to one place in the record that they claim supports their contention that Rubin did not learn of the HUD opportunities in his fiduciary capacity but, rather, when he was working for Wallick Construction. That portion of the trial court's decision states, in pertinent part: *Page 20 
 Rubin maintains that in mid to late 1996, his business model for SAR Construction was floundering. Among other things, the supply of unrestricted lots was dwindling, construction costs were rising, and margins were declining. He claims to have seen the "writing on the wall" and began looking for new opportunities.
 In the fall of 1996, Rubin and Edelman agreed to form a new division of SAR Construction to pursue HUD related apartment construction and other commercial work. A separate entity, jointly owned by Sheryl and Julie, was proposed so that female business enterprise work could be pursued. Such an entity was never formed. Instead, Rubin formed SAR Building Company and pursued the venture without Edelman.
 On October 2, 1996, Rubin and Julie formed SAR Building Company for the purpose of moving into HUD-financed apartment construction, a business Rubin had pursued while he was employed by Wallick in the 1980s.
(June 10, 2003 Decision, at 15; emphasis added.)
 {¶ 59} The portion of the record Rubin states supports his position is equivocal at best. The corporate opportunity that Rubin misappropriated was not the knowledge of how to pursue the business of building HUD financed apartments. Admittedly, Rubin acquired knowledge of that aspect of the residential construction industry while he was employed by Wallick Construction Company. Rubin also learned about the business model of Wallick Construction and presumably many other aspects of residential construction industry during his tenure at Wallick. It is absurd to claim that Rubin learned of the HUD opportunity years before he and Edelman began doing business, just as it is absurd to claim that every residential housing project Rubin undertook after leaving Wallick was an opportunity that he appropriated prior to forming any of his entities. *Page 21 
 {¶ 60} The record shows that the corporate opportunity Rubin misappropriated arose after Rubin saw the writing on the wall, and began searching for new opportunities for SAR Construction. There is no question that Rubin began searching for new opportunities in his fiduciary capacity as the head of SAR Construction. However, after reaching agreement with Edelman to pursue those opportunities, Rubin failed to form a new division of SAR Construction. Instead, Rubin pursued the corporate opportunity to pursue HUD-related apartment construction and other commercial work in a manner designed to cut Edelman out of the entire plan.
 {¶ 61} Appellants also take issue with the trial court's finding that SARBG was in the same line of business as SAR Construction, to wit: the business of residential construction. First, Rubin admitted this in his answer to the complaint. (Answer at paragraph 57.) Second, the evidence at trial showed that the process of building the business proceeded as follows. Initially, SAR Construction pursued single family homes and land development. Then the business expanded to condominium development and construction, and from there to apartment construction. This progression was a continuation of the line of business of constructing residential housing. Appellants have pointed to no evidence in the record that contradicts the trial court's finding.
 {¶ 62} Additionally, by using the assets, personnel, facilities, and goodwill of SAR Construction to form SARBG, Rubin violated his fiduciary duty of good faith, of disclosure, and of loyalty to Edelman. The conduct also violated the duty to avoid self-dealing. The trial court was correct in determining that Rubin should not be permitted to benefit from this conduct. *Page 22 
 {¶ 63} The fifth assignment of error is not well-taken and is overruled.
 {¶ 64} In their sixth and final assignment of error, appellants contend that the punitive damages award denied Rubin's right to due process. Rubin argues that the trial court erred in not holding a hearing on what an appropriate amount of punitive damages should be. Appellants cite no authority for their contention that due process considerations require a hearing on punitive damages. Appellants citeMoskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, for the proposition that punitive damages should not exceed one's net worth. Appellants then state that "we don't have any idea of Mr. Rubin's net worth," and conclude that a hearing is called for. (Appellants' Brief, at 24.) Additionally, appellants assert that the punitive damages award was arbitrary, and the trial court did not conduct any analysis of how it arrived at its figure.
 {¶ 65} The purpose of punitive damages is not to compensate the plaintiff, but to punish and deter certain conduct. Moskovitz, at 651. While there is no one categorical approach to determining the appropriate amount of punitive damages, the Supreme Court of Ohio and many other appellate courts look to certain guideposts in considering whether punitive damages are excessive. They are: (1) the degree of reprehensibility of a defendant's conduct; (2) the disparity between the harm or potential harm to the plaintiff and the amount of the punitive damages; and (3) the difference between the amount of punitive damages awarded and the civil or criminal sanctions available to be imposed for similar misconduct. BMW of North America, Inc. v. Gore (1996),517 U.S. 559, 116 S.Ct. 1589. The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. Id. at 575. *Page 23 
 {¶ 66} In Williams v. Aetna Fin. Co. (1998), 83 Ohio St.3d 464, the Supreme Court of Ohio discussed BMW v. Gore in the following way:
 * * * The court appeared to reject a categorical approach, with the result that the list of guideposts probably is not exhaustive, so that other factors likely will be relevant in the appropriate case. Furthermore, it would appear that when one of the guideposts is particularly relevant, a lesser reliance on the other guideposts may be justified. * * *
Id. at 479.
 {¶ 67} An extensive trial on the issue of damages took place in this case as well as hearings on contempt motions filed by appellees. Appellants were well aware of the punitive damages claim, and they had ample opportunity to present any evidence or make any arguments they wished to on the issue. The trial court considered the punitive damages award in connection with BMW, and found that Rubin lacked credibility, acted in bad faith, disobeyed court orders, disregarded obligations of the court, delayed the proceedings, and caused the appellees to incur additional costs. His pattern of self-dealing and willful and malicious conduct in harming Edelman personally was specifically noted by the trial court. Thus, the reprehensibility of Rubin's conduct formed the basis of the punitive damage award.
 {¶ 68} The trial court further emphasized the reprehensibility of Rubin's conduct, noting that the trial court's predecessor in the liability phase had labeled Rubin "the poster child for the violation of fiduciary duties of good faith." (June 10, 2004 Decision, at 48.) The trial court noted that Rubin acted in accordance with that label in virtually every aspect of the parties' relationship, and in addition, committed contempt of court to obstruct the remedial process. The trial court also viewed Rubin's witnesses at the damage trial *Page 24 
as having intended to mislead the court. The trial court took notice that, on the eve of trial and during the course of the trial, Rubin formed a host of new companies and "cavalierly transferred assets from Scott Rubin Construction to brand new entities." (June 23, 2006 Final Findings of Fact and Conclusions of Law, at ¶ 63.)
 {¶ 69} The trial court indicated that "volumes more could be said about defendant Rubin's misconduct." Id. at ¶ 64. In fashioning its award, the trial court wanted to assure that Rubin did not personally benefit from his many years of wrongdoing.
 {¶ 70} Thus, there was overwhelming evidence that Rubin's conduct formed the basis of the trial court's award of punitive damages, not passion or prejudice on the part of the trial court.
 {¶ 71} Nor was the punitive damages award excessive in light of the large amount of compensatory damages awarded to appellees. InMoskovitz, supra, the jury awarded the plaintiff $3,255,000 in compensatory damages and $3 million in punitive damages. The Supreme Court of Ohio ordered a remittitur of $2 million. Id. at 653. Thus, the punitive damages award was approximately one-third of the compensatory damages award and one-third to one-half of the defendant's net worth. Id. Appellants have cited Moskovitz for the proposition that punitive damages should not exceed net worth, however, in that same case, the Supreme Court of Ohio adopted the view that "[n]o simple mathematical formula can be applied as to either a minimum or a maximum, and there is a wide range between those figures." Id. at 653.
 {¶ 72} In an action for malpractice and conversion initiated by a divorce client against her former attorney, this court upheld a punitive damage award of $75,000, which *Page 25 
was 13 times the $5,500 amount awarded for compensatory damages.Bauer v. Georgeff (Sept. 1, 1998), Franklin App. No. 97APE03-313. The court concluded that the attorney's degree of reprehensibility was high since he ignored both his fiduciary and ethical obligations to his client, and the exemplary damages reflected "the enormity of his offense." Id.
 {¶ 73} While net worth can be a factor in analyzing the reasonableness of a punitive damages award, if such evidence is in the record, it is not a dispositive factor, and appellants have cited no authority for the proposition that a punitive damages award is violative of due process if the trial court does not conduct a hearing to determine net worth. SeeBurns v. Prudential Securities, Inc., 167 Ohio App.3d 809,2006-Ohio-3550, at ¶ 146 ("there is no reliable evidence before this court regarding PSI's net worth. Net worth can be a proper factor in analyzing the reasonableness or excessiveness of a punitive damage award where sufficient evidence of net worth is in the record").
 {¶ 74} The sixth assignment of error is not well-taken and is overruled.
 {¶ 75} Based on the foregoing, we sustain in part and overrule in part assignments of error one and two. We sustain assignment of error three, and we overrule assignments of error four, five, and six. We therefore affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand the matter for further proceedings in accordance with this opinion.
Judgment affirmed in part, reversed in part, and remanded forfurther proceedings.
SADLER, P.J. and BROWN J., concur.
[1] While we questioned the ability of appellants' counsel to appeal on behalf of the Soho entities, given the lack of personal jurisdiction, in the interests of justice we allow appellants to pursue these arguments on appeal because the trial court entered an order of judgment which adversely affected both the original defendants and them. *Page 1