DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} Stockcar races are noisy. In 1987, five couples and one individual, all of whom lived within a mile from what was then known as Buckeye Speedway, sued the speedway's then owner claiming that the speedway was a nuisance. The parties reached a settlement, and the trial court, in May 1988, entered a stipulated judgment entry that limited the number of practices and races that could be held at the speedway and limited the days of the week and hours of the day during which those practices and races could be held.
 {¶ 2} During both 1991 and 1993, plaintiffs moved the trial court to hold the then owner of the speedway in contempt for violating the 1988 stipulated judgment entry. Both times, the trial court held the owner in contempt, ordered it to pay a fine of $1100, and further ordered it not to hold any operations at the speedway for 30 days. Both times, the trial court *Page 2 
"suspended" the sanctions it had imposed, but directed that, if the owner again violated the stipulated judgment entry, the "suspended" sanctions would be imposed.
 {¶ 3} In October 2005, two of the original plaintiffs moved the trial court to hold the current owner of the speedway, now known as Wayne County Speedway, in contempt for violating the 1988 stipulated judgment entry. The trial court found that the owner had violated the stipulated judgment entry a number of times during the 2005 racing season. It held the owner in contempt, ordered it to pay a fine of $1100, and ordered it not to hold any operations at the speedway for 30 days. It also ordered that the sanctions from its previous two contempt findings would be imposed on the current owner and that, therefore, the owner would be required to pay a total fine of $3300 and to not hold any operations at the speedway for 90 days. This Court reverses the trial court's judgment because: (1) it imposed criminal sanctions on the current owner for the claimed 2005 violations and there is insufficient evidence in the record to prove those claimed violations beyond a reasonable doubt; (2) the 1991 and 1993 impositions and suspensions of sanctions were of no effect and, because there is insufficient evidence in the record to prove the claimed 2005 violations beyond a reasonable doubt, the re-imposition of the 1991 and 1993 sanctions must be vacated; and (3) because the sanctions must be vacated, the attorney fees award must be vacated as well.
 THE 1988 STIPULATED JUDGMENT ENTRY {¶ 4} The stipulated judgment entry, which was filed on May 9, 1988, contained four substantive provisions aimed at regulating operations at the speedway. Paragraph one required the then owner of the speedway to "make a good faith effort to complete all racing events by no later than 12:00 midnight." It provided, in that same paragraph, that racing past midnight "shall *Page 3 
occur only in the event of rain or accident delay, and in no event shall racing continue past 2:00 a.m."
 {¶ 5} Paragraph two prohibited the then owner from holding "more than six special events per racing season in addition to its normal once-a-week (currently Saturday) racing schedule." Paragraph three prohibited the then owner from permitting "more than one practice session per week, and it shall be on a Tuesday or Wednesday and be concluded no later than 10:00 p.m." Finally, paragraph four provided that, during weeks when the then owner "hosts two racing events (one special in addition to its regular race night), no practice session shall be held except that [the owner] may hold such a practice session twice during the racing season, but said practice is to be concluded no later than 8:00 p.m."
 {¶ 6} The stipulated judgment entry specifically provided that the trial court was not making a finding that activities at the speedway were a nuisance. It also provided that the "terms and conditions imposed" by it would be binding on the then owner, "its lessees, successors, and assigns."
 THE 1991 JUDGMENT ENTRY {¶ 7} In June 1991, the original plaintiffs moved the trial court to hold the then owner of the speedway in contempt for violating the 1988 stipulated judgment entry. They alleged that the owner had, on a number of occasions, allowed "racing events" to continue past midnight.
 {¶ 8} On August 1, 1991, the trial court filed a judgment entry in which it recited that the then owner of the speedway had acknowledged that it had violated "the terms and provisions" of the stipulated judgment entry. The trial court found the owner in contempt, ordered it to pay a fine of $1100, and ordered it to suspend its racing operations for 30 days. It directed that, if less than 30 days remained in the speedway's season, the suspension would carry *Page 4 
over and be served in the "next and following racing season." The trial court directed that the sanctions imposed on the owner would be suspended provided, however, that "if the [owner] after July 10, 1991, again violates this Court's Order dated May 9, 1988, and the Court so finds, then the punishment hereinbefore stated shall be forthwith executed."
 THE 1993 JUDGMENT ENTRY {¶ 9} On May 21, 1993, the original plaintiffs again moved the trial court to hold the then owner of the speedway in contempt for violating the 1988 stipulated judgment entry. They again alleged that the owner had not made a good faith effort to end racing by midnight.
 {¶ 10} On December 23, 1993, the trial court filed a judgment entry in which it recited that the parties had stipulated that the number of participants in races at the speedway had increased by about one-third between 1988 and 1993, going from between 95 and 100 to approximately 130. They further stipulated that, in 1987, the year before the 1988 stipulated judgment entry, racing at the speedway was completed before midnight approximately 68% of the time and that, in 1993, racing was completed before midnight less than 50% of the time.
 {¶ 11} Based on the stipulated facts, the trial court found that the then owner of the speedway had not made the "good faith effort" to complete racing before midnight required by the 1988 stipulated judgment entry and held it in contempt. It again directed the owner to pay a fine of $1100 and ordered it to suspend its racing operations for 30 days. Finally, it again suspended the sanctions it had imposed. It concluded: "In addition, the punishment imposed by this Court's Judgment Entry dated August 1, 1991, which was suspended at that time, shall continue to be suspended at this time. Provided, however, that if the [then owner] again violates this Court's Order dated May 9, 1988, then both of the suspended punishments shall be executed." *Page 5 
 THE 2006 JUDGMENT ENTRY {¶ 12} On October 4, 2005, two of the original plaintiffs moved the trial court to hold the current owner of the speedway in contempt for violating the 1988 stipulated judgment entry. The trial court held an evidentiary hearing and, on November 3, 2006, filed a judgment entry in which it found that the owner had violated the 1988 stipulated judgment entry during the 2005 racing season by not making a good-faith effort to complete racing by midnight, by permitting practice sessions on days other than Tuesdays or Wednesdays, and by holding more than two racing events in a single week. The trial court held the current owner in contempt, ordered it to pay a fine of $1100, and ordered it to suspend its racing operations for 30 days. The trial court further ordered "that the punishment imposed by this Court's Judgment Entries dated August 1, 1991, and December 23, 1993, are hereby ordered for an aggregate suspension of ninety (90) days and a fine of three thousand, three hundred dollars ($3,300), commencing May 5, 2007." The trial court awarded the plaintiffs $5000 as attorney fees.
 {¶ 13} The current owner has not suggested that the 1988 stipulated judgment entry is not binding on it. For purposes of this opinion, therefore, this Court has assumed, without deciding, that it is.
 CLASSIFYING CONTEMPT AND ITS SANCTIONS GENERALLY {¶ 14} Contempt is either direct or indirect, depending on where it happens. See Cincinnati v. Cincinnati Dist. Council 51,35 Ohio St. 2d 197, 202-03 (1973). Direct contempt is "disruptive or disrespectful behavior committed in the presence of the court or so near the court's presence as to disrupt the administration of justice." Margit Livingston, Disobedience and Contempt, 75 Wash. L.Rev. 345, 349 (2000). Indirect contempt occurs outside the court's presence. Id at 351. *Page 6 
 {¶ 15} Regardless of whether a particular contempt is direct or indirect, the sanctions imposed based on that contempt may be either criminal or civil. If the primary purpose of the sanction is to punish the defendant for a completed violation of a court's order, it is a criminal sanction. See Brown v. Executive 200 Inc., 64 Ohio St. 2d 250,254 (1980); Livingston, 75 Wash. L.Rev. at 353. If the primary purpose of the sanction is to benefit the plaintiff, it is a civil sanction. Livingston, 75 Wash. L.Rev. at 352.
 {¶ 16} Civil contempt sanctions are further classified as remedial or coercive. See Brown, 64 Ohio St. 2d at 253. Like criminal sanctions, remedial civil sanctions are imposed for completed violations. "Remedial civil contempts serve to compensate plaintiffs for damages suffered because of the defendant's disobedience of a court order." Livingston, 75 Wash. L.Rev. at 351. To be entitled to an order imposing a remedial civil sanction, plaintiffs must "prove their pecuniary loss as they would in any legal action for damages." Id. at 352.
 {¶ 17} Coercive civil sanctions are imposed when the defendant is engaged in an ongoing violation of a court's order. The purpose of a coercive civil sanction is to induce the defendant to stop the ongoing contemptuous behavior. "For example, if the court orders the defendant to disclose the whereabouts of his child and he refuses, the court might impose a per diem fine or indeterminate prison term to induce the defendant to comply with the order." Livingston, 75 Wash. L.Rev. at 352. Defendants imprisoned under a coercive civil sanction hold the "keys [to their] prison in [their] own pockets." Brown,64 Ohio St. 2d at 253. As soon as they purge the contempt by stopping the ongoing violation, they are released. Mine Workers v. Bagwell, 512 U.S. 821, 828
(1994) (citing Gompers v. Bucks Stove Range Co., 221 U.S. 418, 442
(1911)). *Page 7 
 CLASSIFYING THE CONTEMPT AND SANCTIONS IN THIS CASE {¶ 18} The owner's first assignment of error is that the trial court incorrectly imposed criminal sanctions on it. In its 2006 judgment entry, the trial court did not explicitly indicate whether it believed it was imposing civil or criminal sanctions. It did, however, imply that it believed it was imposing civil sanctions: "The purpose of sanctions in a case of civil contempt is to compel the contemnor to comply with lawful orders of a court, and the fact that the contemnor acted innocently and not in intentional disregard of a court order is not a defense to a charge of civil contempt. . . . Therefore, `the absence of willfulness does not relieve from civil contempt,' and proof of intent to violate is not required." 2006 Judgment Entry at 2 (quotingWindham Bank v. Tomaszczyk, 27 Ohio St. 2d 55, paragraph three of the syllabus, 58 (1971)).
 {¶ 19} None of the incidents of contempt that the trial court found occurred during the 2005 racing season took place in or near the court's presence. The alleged racing past midnight, alleged practices on other than Tuesdays or Wednesdays, and alleged holding of more than one race and one special event in a single week all would have taken place at the speedway. The alleged contempt in this case, therefore, was indirect contempt.
 {¶ 20} All of the alleged incidents of contempt that the trial court found occurred during the 2005 racing season were completed before the court imposed sanctions on the owner. The sanctions, therefore, could not have been coercive civil sanctions aimed at inducing the owner to stop ongoing contemptuous behavior.
 {¶ 21} Further, neither the $1100 fine nor the order that the owner suspend racing operations for 30 days was for the purpose of compensating the plaintiffs for the owner's alleged violations of the 1988 stipulated judgment entry during the 2005 racing season. The plaintiffs did not present any evidence that they suffered pecuniary loss because of the alleged violations, *Page 8 
and the trial court did not order the fine paid to them. While the plaintiffs were probably pleased by the order that the owner suspend racing operations for 30 days, that order cannot be classified as compensatory.
 {¶ 22} Rather, both the fine and the order to suspend racing operations for 30 days were for the purpose of punishing the owner for its alleged completed violations of the 1988 stipulated judgment entry during the 2005 racing season. As such, they were criminal sanctions.
 {¶ 23} A trial court cannot impose criminal contempt sanctions on a defendant unless it has afforded the defendant rights and privileges required in a criminal proceeding. "For, notwithstanding the many elements of similarity in procedure and in punishment, there are some differences between [civil contempt and criminal contempt] which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." Gompers v. Buck's Stove Range Co.,221 U.S. 418, 444 (1911). See Brown v. Executive 200 Inc.,64 Ohio St. 2d 250, syllabus (1980) ("The standard of proof required in a criminal contempt proceeding is proof of guilt beyond a reasonable doubt.").
 {¶ 24} It is unclear from the trial court's 2006 judgment entry what burden of proof it used in weighing the evidence that was before it regarding the owner's alleged violations of the 1988 stipulated judgment entry during the 2005 racing season. The evidence in the record, however, is insufficient to prove those alleged violations beyond a reasonable doubt. Since proof beyond a reasonable doubt is a prerequisite to imposition of criminal sanctions, therefore, the trial court's finding that the owner was in contempt based on those alleged violations must be reversed. *Page 9 
 {¶ 25} The Ohio Supreme Court has held that, "[i]n cases of criminal, indirect contempt, it must be shown that the alleged contemnor intended to defy the court." Midland Steel Prods. Co. v. U.A.W. Local 486,61 Ohio St. 3d 121, paragraph two of the syllabus (1991). Further, inCollette v. Collette, 9th Dist. No. 20423, 2001 WL 986209, at *3 (Aug. 22, 2001), this Court held that, "for a person to be held in contempt for disobeying a court decree, the decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him." Id. (quoting Ex Parte Quevedo, 611 S.W.2d 711, 713 (Tex App. 1981)). It is unclear from the Collette opinion whether the trial court had imposed a criminal or civil sanction in that case. In view of the requirement that, before a criminal contempt sanction can be imposed on a defendant, the evidence must prove beyond a reasonable doubt that he "intended to defy the court," however, regardless of whether an order must be "clear, specific, and unambiguous" to support a civil contempt sanction, there can be no doubt that it must be "clear, specific, and unambiguous" to support a criminal contempt sanction.
 RACING PAST MIDNIGHT {¶ 26} The 1988 stipulated judgment entry prohibited racing past 2:00 a.m. under any circumstances. It further provided that the owner was required to "make a good faith effort to complete all racing by no later than 12:00 midnight" and that racing past midnight "shall occur only in the event of rain or accident delay." In order for the trial court to impose a criminal sanction based on this prohibition, the plaintiffs would have had to present evidence that, if believed, proved beyond a reasonable doubt that racing either continued past 2:00 a.m. or continued past midnight and its doing so was not caused by rain or an accident delay. *Page 10 
 {¶ 27} Leota Nussbaum, one of the complaining plaintiffs, after refreshing her recollection by consulting an entry in her journal that she said she had made on the morning of June 19, 2005, testified that racing continued past midnight on June 18th, and in fact, had not ended until 1:45 a.m. on June 19th. She further testified, however, that she did not know whether there had been any rain or accident delays that evening: "No. I didn't mark delays or anything down so I can't answer that."
 {¶ 28} Tina Heil, the general manager of the speedway, testified that all racing was completed prior to midnight on June 18th. She authenticated score sheets from that evening that indicated that the last race began at 11:48 p.m. and finished at 11:55 p.m. She was not asked about rain or accident delays.
 {¶ 29} The trial court specifically found that Ms. Nussbaum's testimony was "highly credible." Although her testimony was sufficient to permit a finding beyond a reasonable doubt that racing continued past midnight on June 18th, it was not sufficient to permit a finding that the racing past midnight was not caused by rain or an accident delay. In the absence of evidence regarding whether there were or were not rain or accident delays, the plaintiffs failed to prove beyond a reasonable doubt that the owner violated the 1988 stipulated judgment entry. The trial court's finding that the owner did not "make a good faith effort to complete all racing events by no later than 12:00 midnight" on June 18, 2005, must be reversed.
 {¶ 30} Carl Forrer, the husband of one of the complaining plaintiffs, lives between two-and three-tenths of a mile from the speedway. He testified that racing continued past midnight on September 3, 2005. According to him, racing continued "until about 12:20, 12:25 on September the 4th, Sunday." Although he testified that the ambulance did not leave the speedway that night, "[b]ecause when that occurs it comes down our road with the ambulance *Page 11 
siren blaring and there's a red light that comes on at the speedway and that did not happen on that date," he further testified that he knew there had been accidents that night.
 {¶ 31} Ms. Heil acknowledged that racing continued past midnight on September 3rd. According to her, the last race began at 12:15 a.m. on September 4th and ended seven minutes later, which is consistent with Mr. Forrer's testimony. She explained that two things contributed to the late finish. First, some extra races had been added that night to make up for races that had not been completed by midnight on August 13, 2005. Second, there had been a "red-flag" crash earlier in the evening on September 3rd, which, according to her, had resulted in the ambulance leaving the speedway to transport a driver to the hospital. She testified that the ambulances do not go past Mr. Forrer's house, which is on Kansas Road, but rather they "go out Carr Road our main entrance down McQuaid to Church to 57 to the hospital." She further testified that she specifically remembered the ambulance going that way on September 3rd: "Yeah, because I knew we were getting close on time and I needed that ambulance to get there quickly so we could continue the race. And I was standing outside on the tower and I watched him, the direction he went." Ms. Heil testified that "it [was] likely" that racing would have finished before midnight if it had not been for the "red flag accident."
 {¶ 32} In its 2006 judgment entry, the trial court did not reject Ms. Heil's testimony about the "red flag accident." Rather, it wrote that she "admitted during her testimony that the racing went past midnight on September 3 because there was a `red flag' accident at the Speedway, and because they had scheduled extra races to make up for races scheduled August 13, 2005, due to a rain-out." 2006 Judgment Entry at 3. Further, as mentioned, Mr. Forrer, while denying there were any "red flag accidents," acknowledged that there were accidents that *Page 12 
night. The stipulated judgment entry does not distinguish between delay caused by "red flag accidents" and delay caused by other accidents.
 {¶ 33} In its 2006 judgment entry, the trial court wrote: "Under the May 9, 1988, Judgment Entry, a reasonable justification allowing racing past midnight is rain or accident delays. Rescheduling races due to a rain-out does not constitute a rain delay. Defendant knew or should have known that rescheduling the August 13 races would cause racing to continue after midnight."
 {¶ 34} Ms. Heil did not testify that the races were rescheduled because of a "rain-out" on August 13th. Rather, she testified that they were rescheduled because it got too late as a result of several accidents: "We had several accidents that night. And I believe this was the night that one of the firemen fell off the fire truck and we had to have EMS come out and pick him up. So we ran out of time so we had to stop and make them up at the next race."
 {¶ 35} The 1988 stipulated judgment entry does not provide that an accident delay cannot justify running a race after midnight if that race was rescheduled from a previous night. The only evidence that touched on whether all racing, including the rescheduled heats, would have been completed by midnight on September 3rd if the accident delay had not happened was Ms. Heil's testimony that "it [was] likely" that it would have been. Plaintiffs, therefore, failed to carry their burden of proving beyond a reasonable doubt that the racing past midnight on that night was not caused by "rain or accident delay." Accordingly, the trial court's finding that the owner did not "make a good faith effort to complete all racing events by no later than 12:00 midnight" on September 3, 2005, must be reversed. *Page 13 
 PRACTICES ON OTHER THAN TUESDAYS OR WEDNESDAYS {¶ 36} The 1988 stipulated judgment entry provided that the speedway "shall not permit more than one practice session per week, and it shall be on a Tuesday or Wednesday and be concluded no later than 10:00 p.m." Mr. Forrer testified that there were "unauthorized practice run[s]" on April 9, 2005, and April 16, 2005, both of which were Saturdays.
 {¶ 37} He described the activity he saw at the speedway on the 9th as one car running the track at high rates of speed. "About 1:00 on Saturday afternoon I was in my orchard pruning trees. I was up on a ladder and I heard a race type car coming from the direction of the speedway. And I looked over in that direction and I saw a car running the track at the speedway at 1:00 in the afternoon, high rates of speed going around and around the track continuously. There would be a break for a few minutes and then the activity would start up again. . . . That activity, that practice going on over there continued until at least 4:50 in the afternoon when my wife and I left the premises to go to a play in Cleveland. So I know it was going on for at least 1:00 in the afternoon until at least 4:50 in the afternoon."
 {¶ 38} Ms. Heil testified that, on April 9, 2005, she and some other people were at the speedway testing different ways to prepare the track surface "to cut down on dust and prep time." According to her, they "needed to have cars on the track that day after our equipment was running the track in to test the track to see how it reacted to the cars on the track." She explained that they were using a tractor pulling a tiller, a water truck, and two race cars. She said that they tested the track by having the cars run on it. "We would know [in] probably four or five laps. And what we did is we would pull them off. We would put the truck and water back on the track again and then send them out for a couple more laps." She testified that they were testing the surface that day from about noon until around 3:00 p.m. *Page 14 
 {¶ 39} Clint Coffman, the son of the current owner of the speedway, testified that he drove one of the cars used on the track on April 9th. He explained that they "had changed the way [they] were preparing the race track to try to change the service, control dust, make the show go faster, and had [their] race car[s] there to test and see how [the] race track was holding up to the race car." He agreed with Ms. Heil that they were at the speedway from around noon until 3:00 p.m.
 {¶ 40} Except for the discrepancy concerning the time they stopped testing the track surface, Ms. Heil's and Mr. Coffman's testimony was consistent with Mr. Forrer's testimony. According to all three, a car would run some laps, there would be a break, and a car would run some more laps.
 {¶ 41} In its 2006 judgment entry, the trial court wrote that "Defendant's witnesses testified that two drivers were testing new methods for prepping the track and were also testing tires." In fact, Mr. Coffman was clear on cross-examination that they were testing how the track surface reacted to different sized tires, not "testing tires":
 Q. In fact, I believe you said that you were testing the tires on the track in your deposition is what you said, right?
 A. Testing the way the tires react to the race track.
 Q. Right.
 A. There's different sized tires on different cars to see what that does to the race surface. Not testing tires as in if it's a good tire or a bad tire based on the race car.
 Q. Okay, but still testing the tires, right?
 A. Testing the race track. *Page 15 
There was no evidence before the trial court that the people at the speedway on April 9th were "testing tires."
 {¶ 42} The phrase "practice session" was not defined in the 1988 stipulated judgment entry. This Court cannot say that, by prohibiting "practice session[s]" on other than Tuesdays or Wednesdays, the 1988 stipulated judgment entry "clearly, specifically, and unambiguously" prohibited the activity that occurred at the speedway on April 9, 2005. Although the evidence before the trial court proved beyond a reasonable doubt that two race cars ran some laps on April 9, 2005, there was insufficient evidence to prove beyond a reasonable doubt that there was a "practice session" that day. Accordingly, the trial court's finding that the owner of the speedway violated the 1988 stipulated judgment entry by holding a practice session on April 9, 2005, must be reversed.
 {¶ 43} Mr. Forrer also testified that the speedway's published schedule indicated that there was to be "an open practice" on Saturday, April 16, 2005, from 6:00 p.m. until 10:00 p.m. He further testified that there were cars running the track that evening. According to him, the speedway began to quiet down around 10:00 p.m., but two or three cars continued to run until about 10:50 p.m. On cross-examination, Mr. Forrer acknowledged that the speedway's published schedule actually indicated that the event on April 16th was an "open practice and media day."
 {¶ 44} Ms. Heil testified that April 16, 2005, was the speedway's annual media night: "We invite any type of media whether it be TV, radio, newspaper to come and talk with our drivers, see what we do. And they can come and see the cars while they're still in good shape, no scratches. They're all brand new, and get any information and watch, you know, what we do." When asked why it was called a practice in addition to being called media day, she *Page 16 
responded: "It's basically a practice for our staff. We have change over in staff for numerous reasons. And it helps us to get our staff people in line to what their job is and to get — — make sure our computers are working, make sure our timing devices are working, our scoring is working. And it allows our driver's to test and tune their cars." Ernie Coffman, the current owner of the speedway, testified that part of the purpose of media day is to assist drivers in finding sponsors.
 {¶ 45} The 1988 stipulated judgment entry specifically provided that the speedway could hold "no more than six special events per racing season in addition to its normal once-a-week (currently Saturday) racing schedule." Like the phrase "practice session," the phrase "special event" is not defined in the stipulated judgment entry. There was no evidence before the trial court that, not counting April 16th, the speedway held six special events during the 2005 season.
 {¶ 46} The trial court found, "[b]ased upon the plaintiffs' testimony, and the information on Defendant's website, . . . the event held on April [16], 2005, was a practice session and a violation of the Court's order." Since neither the phrase "practice session" nor the phrase "special event" was defined in the 1988 stipulated judgment entry, the evidence that was before the trial court was not sufficient to prove beyond a reasonable doubt that the activity that occurred at the speedway on April 16, 2005, was a "practice session" as opposed to a "special event." The trial court's finding that the owner of the speedway violated the 1988 stipulated judgment entry by holding a practice on April 16, 2005, must be reversed.
 MORE THAN TWO EVENTS IN ONE WEEK {¶ 47} The 1988 stipulated judgment entry does not explicitly prohibit the speedway from holding more than two racing events in a single week. Paragraph four of that judgment entry, however, provides: "During the weeks that Buckeye Speedway hosts two racing events *Page 17 
(one special in addition to its regular race night), no practice session shall be held except that Buckeye Speedway may hold such a practice session twice during the racing season, but said practice session is to be concluded no later than 8:00 p.m."
 {¶ 48} It is undisputed that the speedway held racing events on June 25, 26, and 27, 2005, a Saturday, Sunday, and Monday, and on July 4, 2005, the following Saturday. Plaintiffs argued that, by doing so, the speedway had held more than two racing events in a week and, thereby, violated the 1988 stipulated judgment entry. The trial court wrote in its 2006 judgment entry that, "[i]t is clear from the Judgment Entry that the Court intended to limit the Speedway to no more than two events in a single week."
 {¶ 49} Ernie Coffman, the current owner of the speedway, testified that he did not understand the 1988 stipulated judgment entry as prohibiting more than two racing events in a single week:
 Q. Did Wayne County run more than six special events in 2005?
 A. No.
 Q. Were you ever made aware of any restriction as to when those special events could occur?
 A. No. I just knew there were six special. As far as I knew you could run them six in a row if you want.
Mr. Coffman argued that, even if the 1988 stipulated judgment entry could be read as prohibiting more than two racing events in a single week, the speedway did not violate it. According to him, the events on Saturday and Sunday, June 25th and 26th, took place during one week and the events on Monday, June 27th, and Saturday, July 4th, took place the following week. The trial *Page 18 
court rejected Mr. Coffman's argument that a new week began on June 27th, because, during his testimony, Mr. Coffman acknowledged that he considered a "racing week" as beginning on Saturday.
 {¶ 50} As noted previously, "for a person to be held in contempt for disobeying a court decree, the decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him." Collette v. Collette, 9th Dist. No. 20423, 2001 WL 986209, at *3 (Aug. 22, 2001). The 1988 stipulated judgment entry does not spell out in clear, specific, and unambiguous terms that the speedway is prohibited from holding more than two racing events in a single week. At best, that can be inferred from a provision aimed at prohibiting practice sessions during weeks when there are more than one racing event. An inference is not sufficient to serve as a basis for a criminal contempt sanction.
 {¶ 51} Even if an inference could be viewed as sufficient to prohibit more than two racing events in a single week, the 1988 stipulated judgment entry is still deficient because it does not define when a week begins and ends for that purpose. The question is not what Mr. Coffman considers a "racing week." The question is what a week is within the meaning of the 1988 stipulated judgment entry. Inasmuch as there is nothing in the stipulated judgment entry that excludes the possibility that a week, for purposes of the stipulated judgment entry, begins on Monday, the judgment entry does not clearly, specifically, and unambiguously prohibit the speedway from holding racing events on a Saturday, Sunday, Monday, and the following Saturday. The trial court's finding that the owner of the speedway violated the 1988 stipulated judgment entry by holding racing events on June 25, 26, and 27 and July 4, 2005, must be reversed. *Page 19 
 {¶ 52} There was insufficient evidence before the trial court to prove beyond a reasonable doubt that the owner of the Wayne County Speedway violated the 1988 stipulated judgment entry during the 2005 racing season. The trial court incorrectly imposed criminal sanctions on the owner for the claimed violations during the 2005 racing season, and, therefore, the owner's first assignment of error is sustained.
 IMPOSITION OF THE PREVIOUSLY SUSPENDED SANCTIONS {¶ 53} The owner's fourth assignment of error is that the trial court incorrectly, in 2006, re-imposed the sanctions that it had originally imposed and suspended in 1991 and 1993. The owner has not suggested that it is significant that the sanctions imposed and suspended in 1991 and 1993 were based on actions by the previous owner and, for purposes of this opinion, this Court has assumed, without deciding, that that fact is not significant.
 {¶ 54} The starting point of the analysis of this assignment of error must be with the effect of the trial court's warnings in the 1991 and 1993 orders that, if the owner again violated the 1988 stipulated judgment entry, the suspended sanctions would be re-imposed. This Court has already determined that the evidence before the trial court was not sufficient to prove beyond a reasonable doubt that the current owner violated the 1988 stipulated judgment entry during the 2005 racing season. Unless the effect of the 1991 and 1993 judgment entries was to lower the burden of proof for re-imposition of the 1991 and 1993 sanctions, therefore, the trial court's re-imposition of those sanctions must be reversed.
 {¶ 55} If the 1991 and 1993 judgment entries had suspended the sanctions and placed the then owner on probation for a fixed term, they may have been effective to lower the burden of proof for re-imposition of those sanctions during that fixed term. See Hicks v. Feiock,485 U.S. 624, 639 n. 11 (1988). The trial court, however, did not place the owner on probation for a fixed *Page 20 
term. Rather, its warnings about re-imposition extend forever. Such warnings are nullities. "A contempt order which regulates future conduct `simply amounts to the court's reaffirmation of its previous support order and can have no effect since any effort to punish a future violation of the support order would require new notice, hearing and determination.'" Marden v. Marden, 108 Ohio App. 3d 568, 571 (1996) (quoting Tucker v. Tucker, 10 Ohio App. 3d 251, 252 (1983)). The 1991 and 1993 judgment entries did not lower the burden of proof for re-imposition of the sanctions suspended by those entries. Accordingly, inasmuch as the evidence before the trial court was not sufficient to prove the claimed 2005 violations beyond a reasonable doubt, the trial court's re-imposition of the 1991 and 1993 sanctions must be reversed. The owner's fourth assignment of error is sustained.
 ATTORNEY'S FEES {¶ 56} The owner's fifth assignment of error is that the trial court incorrectly awarded plaintiffs attorney's fees. In view of this Court's sustaining the owner's first and fourth assignments of error, it must sustain this assignment of error as well.
 THE OWNER'S SECOND AND THIRD ASSIGNMENTS OF ERROR {¶ 57} The owner's second and third assignments of error are that the trial court incorrectly held him in civil contempt and incorrectly imposed criminal sanctions on him on the basis of a vague and ambiguous order. In view of this Court's sustaining the owner's other assignments of error, these assignments of error are moot, and are overruled on that basis.
 CONCLUSION {¶ 58} The owner's first, fourth, and fifth assignments of error are sustained. His second and third assignments of error are moot, and are overruled on that basis. This matter is remanded *Page 21 
to the Wayne County Common Pleas Court for entry of judgment in favor of defendant.
Judgment reversed and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellees.
Slaby, J. concurs.